NAGLE MOTORS, INC., Appellant, v. VOLKSWAGEN NORTH CENTRAL DISTRIBUTOR, INC., Respondent.

*No. 37. Argued May 3, 1971.—Decided June 7, 1971.*
(Also reported in 187 N. W. 2d 374.)

414

For the appellant there were briefs by *Aagaard, Nichol & Wyngaard* and *Robert W. Aagaard* and *Michael J.*

*Wyngaard,* all of Madison, and oral argument by *Robert W. Aagaard.*

For the respondent there was a brief by *William F. Nelson* and *Stafford, Rosenbaum, Rieser & Hansen,* all of Madison, attorneys, and *David N. McBride* and *Ross, Hardies, O'Keefe, Babcock, McDugald & Parsons,* all of Chicago, Illinois, of counsel, and oral argument by *Mr. Nelson.*

A brief amicus curiae was filed by *Wheeler, Van Sickle, Day & Anderson* and *Roland B. Day,* all of Madison, for the Wisconsin Automotive Trades Association.

HEFFERNAN, J. Although Nagle Motors is the plaintiff in this equitable action that seeks to restrain the distributor from cancelling the dealer's franchise, the appellant (the dealer) asserts that, under the Wisconsin statutes, the respondent (the distributor) is precluded from defending itself in the Wisconsin courts because it has not secured a certificate of authority pursuant to the Wisconsin corporation law.

The dealer takes the position that secs. 180.847 (1) and 218.01 (2) (bd) 3, Stats., construed together, exclude the distributor from the courts.

Sec. 180.847 (1), Stats., provides:

"No foreign corporation *transacting business* in this state without a certificate of authority, if a certificate of authority is required under this chapter, shall be permitted to maintain or defend a civil action or special proceeding in any court of this state, until such corporation has obtained a certificate of authority. . . ." (Emphasis supplied.)

Sec. 218.01 (2) (bd) 3, Stats., provides:

". . . The obtaining of a license under s. 218.01 [Motor Vehicle Dealers Law] shall conclusively establish that such . . . distributor . . . is *doing business* in this state and shall subject the licensee to all provisions of the Wis-

consin statutes regulating . . . distributors." (Emphasis supplied.)

The argument of the dealer is simply that, since the distributor has a license under sec. 218.01, Stats., it is conclusively established that it is "doing business," and that "doing business," as the term is used in sec. 218.01 (2) (bd) 3, is synonymous with "transacting business" under sec. 180.847 (1), and, hence, the distributor is precluded by the operation of the latter statute from defending itself in the Wisconsin courts.

A visual inspection of the statutes makes it apparent that the appellant's simplistic logic does not establish the conclusion urged. Sec. 180.847 (1), Stats., penalizes a corporation by withholding the privilege of using Wisconsin courts only in the event "a certificate of authority is *required* under this chapter." (Emphasis supplied.) No showing has been made in the trial court that the Wisconsin Business Corporation Law "requires" that North Central be so certified by the Secretary of State. It is thus apparent that the term, "transacting business," as used in sec. 180.847 (1) is subject to other qualifications and conditions set forth in other portions of ch. 180.

We therefore cannot assume, even though we had no other clarifying guidelines, that the terms, "transacting business" and "doing business," are to be read interchangeably in these differing contexts.

Moreover, the two statutes have entirely different purposes.

The annotations to sec. 180.847 (1), Stats., 22 Wis. Stats. Annot. 298, make it clear that the purpose of that statute was to facilitate the collection of a registration fee. It is apparent that this portion of sec. 180.847 no longer has any function in respect to the acquisition of jurisdiction over a foreign corporation, since the jurisdictional aspects are treated in secs. 180.847 (4) and 262.06 (5).

Sec. 218.01 (2) (bd) 3, Stats., is, however, clearly a jurisdictional statute. On its face, it subjects a licensee

"to all provisions of the Wisconsin statutes regulating . . . distributors." The bill-drafting history provides parallel proof of the purpose of the statute. The original draft of the statute, as appears in the bill jacket, provides:

". . . for purposes of doing business in this state [the distributor] shall submit to the jurisdiction of the [motor vehicle] department as to all the provisions of the Wisconsin statutes regulating . . . distributors."

Subsequent draft revisions indicate that the meaning was broadened to include not only the motor vehicle division's jurisdiction, but the jurisdiction of all Wisconsin statutes regulating the distribution of automobiles.

The purpose of sec. 218.01 (2) (bd) 3, Stats., was to provide a jurisdictional basis for bringing an automobile distributor before the motor vehicle division and the state courts, and not for the purpose of forcing a distributor to obtain a certificate of authority under ch. 180.

It should be noted that sec. 218.01 (2) (bd) 3, Stats., does not refer to ch. 180, nor does it purport to create obligations under the general corporation law. "Doing business" as referred to in sec. 218.01 only subjects a distributor to the regulatory provisions as they relate to the control of the automobile industry, not necessarily to those of the general law of corporations. The "ipse dixit" logic of the appellant does not satisfy the court that "doing business" under ch. 218 is the equivalent of "transacting business" as set forth in sec. 180.847 (1).

The dealer, for the first time, in its reply brief asserts that the conduct of the distributor fits the definition of "transacting business" because the record shows that the distributor has agents in this state carrying on its business and supervising its relations with Wisconsin dealers. Had this argument been made at a proper juncture in the trial, the trial court and this court would have been obliged to rule on this assertion. The argument was not made until now and will not, therefore, be considered by

this court. *Gebhardt Bros., Inc. v. Brimmell* (1966), 31 Wis. 2d 581, 143 N. W. 2d 479.

The dealer justifies its position that the distributor should be denied a defense in the Wisconsin courts because, the dealer asserts, it cannot subpoena records across state lines when the distributor has not been issued a certificate of authority by the Secretary of State.

The short answer to this contention is that it has not tried to subpoena any documents, and any assertion, therefore, that it has been denied any documents necessary for the prosecution of its suit is contrary to the facts of record.

It is quite clear that jurisdiction was obtained over the distributor by service of process. The distributor has appeared in the Wisconsin courts and is subject to the discovery devices of subpoena (secs. 885.01 and 885.02, Stats.), and the inspection of documents (sec. 269.57 (1)). The trial judge made it clear that the distributor was compelled to produce various documents upon the dealer's compliance with the Wisconsin procedure. We see in the record no assertion by the distributor that it was not subject to Wisconsin process. At the most it appears that the distributor might have refused to volunteer documents whose production was asked for but not sought to be compelled by process.

The dealer cannot complain that it is being denied the opportunity to use documents necessary for its law suit. It simply has not utilized the usual and simple procedural steps to obtain such documents.

The Wisconsin automobile dealership law requires that every manufacturer, importer, or distributor of motor vehicles be licensed by the state of Wisconsin. Sec. 218.01 (2) (bd) 3, Stats. Sec. 218.01 (3) (a) 17 provides that a distributor's license may be revoked or suspended for cancelling a dealer's franchise "unfairly, without due regard to the equities of said dealer and without just provocation." In *Forest Home Dodge, Inc. v. Karns*

(1965), 29 Wis. 2d 78, 85, 138 N. W. 2d 214, we stated the policy of the law:

"Implicit in this law is the recognition of the gross disparity of bargaining power between the manufacturer of automobiles and the local retailer. It was enacted in recognition of the long history of the abuse of dealers by manufacturers. *Kuhl Motor Co. v. Ford Motor Co.* (1955), 270 Wis. 488, 71 N. W. 2d 420. These laws deal with the relationship between auto manufacturers and auto dealers. The purpose of the law is to furnish the dealer with some protection against unfair treatment by the manufacturer."

While this statute provides for sanctions against a distributor who has cancelled a dealer's franchise contrary to the statutory standards, we have held in *Kuhl Motor Co. v. Ford Motor Co., supra,* that a dealer could resort to the statutory standards when bringing an action to restrain an unlawful revocation of his franchise.

North Central's notice of termination alleged 11 grounds for its proposed action. Testimony was elicited at trial in regard to each of these separate allegations. The trial court determined that 5 of the 11 grounds asserted were established by the evidence and, having so found, concluded that the termination of the franchise of Nagle Motors was with just provocation and with due regard for the equities of the dealer in accordance with the standards of sec. 218.01 (3) (a) 17, Stats.

The legal test to be applied by this court on review is whether the findings made are contrary to the great weight and clear preponderance of the evidence. We are satisfied that four of the findings made by the trial court must be sustained after applying that test. In making each of these findings the trial court found not only that there was just provocation in that there was sufficient proof that a specific agreement had been breached, but additionally that the agreement was reasonable and that termination of the franchise for the breach or the com-

bination of them was proper, bearing in mind the equities of the dealer.

The court found that the dealership had failed to comply with the beneficial ownership provisions of the agreement. As set forth in the statement of facts, it was agreed that Nagle would have 80 percent of the beneficial ownership of the dealership and Toulon would have the other 20 percent. The trial court found, after hearing expert testimony, that the requirement was reasonable and that it was sound business judgment for the distributor to contractually provide for, and to insist that the managers of the dealership have, a substantial beneficial ownership, so that there would be proper incentive for those responsible for operations to develop and build the business. The facts are undisputed that this portion of the agreement was breached.

At the time the dealer commenced business, contrary to the agreement Toulon owned no stock in the corporation. Although Toulon subsequently purchased $5,000 worth of stock, his beneficial interest never reached much more than half of what the contract required. Although Nagle argues that the dealership was given an extension of time to comply with this provision, the most that the testimony shows is that the distributor granted a two-month grace period.

The dealer now contends that it should be excused from the failure to meet these contractual terms because it was Toulon and not Nagle who was not in compliance. The agreement, however, was not with Nagle or Toulon individually but with the Nagle-Toulon dealership corporation, and the record is clear that the beneficial ownership of the dealership did not comply with the contractual terms. The record is equally clear that the franchise was granted to the corporate dealer in substantial part because it was agreed that Toulon, an experienced auto dealer, was to own a 20 percent interest in the company. Nagle's personal redress under these circumstances is

not against the distributor but against his defaulting fellow shareholder. What Nagle argues is that he and the dealership, which he now solely controls, should be exonerated from the agreement which the distributor, in the exercise of sound business judgment, concluded was necessary. While the record is replete with excuses and alternatives proposed by Nagle, the record is clear that the beneficial ownership requirements were reasonable and that they were breached by the dealership in a material and substantial respect.

The trial court also found that Toulon was not accorded the managerial responsibilities that were required by the agreement. As stated above, Toulon had considerable experience in the automobile business, and Nagle was completely inexperienced. There was much testimony to show that experience was an important ingredient in the success of an automobile dealership. There was also testimony to show that crucial decisions in the management of the dealership were made by persons who, in the reasonable business judgment of the distributor, ought not to have made such decisions. However, we conclude that the testimony supporting the trial judge's findings in this respect is, at best, equivocal. Although Toulon complained he was not able to do his job as general manager because he had no control over the business, he also complained that he had too many managerial functions to perform. There was testimony by Nagle that Toulon managed new car sales as well as used car sales. The evidence would amply support the finding that Toulon and Nagle were at odds in regard to the exercise of their respective managerial functions, but we cannot conclude, as did the trial judge, that Toulon was bereft of the managerial responsibility required by the contract. The trial court's finding in this respect is contrary to the great weight and clear preponderance of the evidence.

The trial court found that, contrary to the dealership agreement, Toulon was discharged without the prior writ-

ten consent of the distributor. The dealership agreement provided that no change in executive power or responsibility was to be undertaken without the prior consent of the distributor. The reasonableness of such an agreement is particularly apparent in this case. Toulon was experienced in the business and his continued tenure in a managerial position in the dealership was considered essential to the success of the dealer. It was made clear from the very outset of the dealings between the parties that the distributor had no confidence in Nagle's ability to manage the dealer's affairs. The provision was reasonable in that the distributor did not wish to leave the conduct of the dealer in the hands of one who was trying his hand for the first time at this type of enterprise.

Nagle acknowledges that he knew that when he fired Toulon without prior advice to the distributor he was breaching the agreement. Nagle alleges, however, that Toulon was fired for cause and that he misused corporate funds and property. No specific finding in that respect was made by the trial court. The only evidence supporting the charges was the testimony of Nagle. In addition, the facts indicate that these reasons for the discharge were not given to the distributor's representative until two months after the discharge. The record is full of evidence of disagreements between the parties, and the court on the basis of this record could have concluded that the firing was not for cause but because of personal antagonism between the two shareholders. The trial court's finding that the discharge of Toulon without prior written consent was a material and substantial violation of a reasonable contract provision is not contrary to the great weight and clear preponderance of the evidence.

In addition, the trial court found that the dealership had failed to comply with the "cash and equivalent" provisions of the agreement. The agreement required that the dealer have on hand "cash and equivalent" sufficient

for a two-month period of operations. "Cash and equivalent" referred to actual cash plus any marketable assets of the dealership which could be turned into cash immediately. In the context of this case, it referred to the dealer's cash in the bank plus its ownership rights in new car and demonstrator inventories. Testimony at trial indicated that most dealership agreements provided that there need be on hand "cash and equivalent" equal to one month's average operating expenses. Because of the fact that the dealer was dependent upon the long supply line from the Volkswagen manufacturing corporation in Germany, a two month supply of "cash and equivalent" was considered necessary. There was testimony by persons well versed in the automobile industry that this requirement was the product of reasonable business judgment. In the case of Volkswagen, a dealer was particularly vulnerable to disruptions by strikes and interruptions in numerous places along an extended and attenuated line of supply.

The record shows that the dealer failed to meet the "cash and equivalent" requirement during every month of 1968 and that the deficiency increased from $7,562 in January 1968 to $49,297 in December 1968. At the same time, the net cash available, *i.e.*, "cash and equivalent" less cash necessary to pay liabilities accruing within thirty days and an additional one month's expense dropped to a minus $87,743. Counsel for the dealer argues that this deficiency occurred at a time when no new agreement had been executed for 1968 and the parties were operating under the extension of the 1967 agreement and that such deficiency would have been covered upon the execution of a new agreement. The failure to enter into a 1968 agreement was as the consequence of the dealership's breach of the benefical ownership provisions discussed above. The mere fact that the dealership had substantially breached one provision of the contract did not excuse its deficiencies in other respects.

Although counsel for the dealer acknowledges the deficiency in its cash position, it asks that it be exonerated from these provisions of the contract because it was meeting its sales objectives in terms of new cars and parts. There was, however, expert testimony to the effect that new sales were generated only as the result of inordinate expenses and that, concomitant with its meeting of its sales objectives, its cash position had markedly deteriorated. The deterioration was so great that an undisputed expert in the field gave as his opinion that the dealer, if permitted to remain in business, would probably fail. The trial court found that the "cash and equivalent" requirement of the contract was reasonable and that there was a substantial breach of the agreement. Such finding is not contrary to the great weight and clear preponderance of the evidence.

The trial judge also found that there was a substantial impairment of the dealer's financial reputation and standing contrary to the terms of the agreement. This finding was based primarily upon the dealership being "out of trust" in its financing agreements with the local bank. New automobiles were purchased by the dealer on a "trust receipt" arrangement financed by a local bank. Under this arrangement, automobiles are shipped directly to the dealer and simultaneously the distributor submits a draft to the bank for the wholesale price of the automobile. This draft is paid on sight by the bank, and the bank then takes a security interest in the automobiles that are on the sales floor of the dealer.

In the instant case the dealership's trust agreement with the bank provided that the bank be paid within twenty-four hours after the purchase price was paid by the retail buyer. There was evidence that there was a subsequent oral agreement which permitted the bank to insist on collection only at such time as its checker came to the premises and found that an automobile had been sold. The bank, however, reserved its right to revert

to the original terms at any time it felt its interests were jeopardized. The distributor first concluded that there was a probability that the dealer was seriously "out of trust" when the financial statements of the dealer for December, 1968, showed an extreme difference between the value of the new car and demonstrator inventory and the security interest of the bank. A subsequent audit confirmed these suspicions. There was evidence to show that the average time between payment by a retail purchaser and payment of the wholesale price to the bank was fifteen and three-tenths days. The wholesale price of one vehicle was not paid over to the bank until thirty-five days after it was paid for by the consumer. There was expert testimony that the distributor had reasonable grounds in 1968 to believe that the dealer would lose its floor plan financing. There was also testimony that the loss of this type of financing would be a death knell to future operations by the dealer. The bank's representative stated that it acquiesced in a deviation from the terms of the trust agreement because Nagle had made separate security deposits. However, it is significant to note that every day in delay in payment to the bank resulted in increased interest charges and contributed measurably to the dealer's cost of doing business. The bank's representative at trial stated that, had he known the facts concerning the dealer's cash position, the bank would have terminated its floor plan agreement with the dealer.

It is apparent that this "out-of-trust" condition placed the dealership in extreme jeopardy. It was not in conformity with its agreement to the bank and its day-to-day existence depended solely upon the bank's indulgence and forbearance. The bank was placed in the position of weighing the benefits of increased interest payments against the possible jeopardy to its security interests. In short, the distributor's assurance that it would have a viable dealership rested not upon the sound business condition of that dealership but upon the grace extended to

the dealer by a third party over whom the distributor had no control.

There was testimony that Volkswagen and its distributor's reputation depends in part upon the reputation of its dealers and that, where a dealer is in a financially precarious situation, banks are likely to terminate financing, and the continuity of all services through that dealership is threatened. The trial court found that the distributor had a substantial interest in assuring itself that its dealer's financial standing or reputation was not impaired. The court, therefore, found that reasonable business judgment dictated the terms of the contract that provided for termination in the event of "Impairment of the reputation or of the financial standing of Dealer." The trial court's conclusion that the financial standing of the dealer was impaired is not contrary to the great weight and clear preponderance of the evidence. The contract terms with respect thereto were reasonable.

We are therefore satisfied that the trial court properly found that there had been several substantial and material breaches of the contract provisions under which the dealership was franchised. We affirm the trial judge's conclusion that the termination was fair, upon just provocation, and with due regard to the equities of the dealer.

We should note in passing the very important point raised in the brief amicus curiae submitted by the Wisconsin Automotive Trades Association. That brief takes the position that the trial court erred when it failed to weigh the equities of the dealer in reaching the conclusion that the determination was consonant with the statutory guidelines. After a careful perusal of the trial court's memorandum decision, we can understand the reason for the concern of the amicus curiae. We are satisfied, however, that, although we believe that the trial judge at one point in his opinion misinterpreted the

statutory term, "equities," nevertheless his conclusions were based on a proper interpretation of the statutes. It appears that the trial judge stated at one point that he interpreted the term, "equity," to mean the investment equity of the stockholders in a dealership. He reached the conclusion that, given that interpretation, the equity in a large enterprise would be by definition greater than that in a small enterprise and that the statute as so interpreted would provide little or no protection to a small dealer and greater protection to a dealer with a substantial investment equity in the business. We conclude that such interpretation is erroneous and that, in the context of the statute, the legislature was not primarily concerned with the investors' equity or capital. The meaning of the term clearly relates primarily to the concept of fairness, impartiality, and justice and is not tied solely to the concept of equity or venture capital in the investment sense. Accordingly, "due regard to the equities" as used in the statute relates to whether the provisions breached were reasonable and whether the distributor was just and fair in enforcing the terms of the contract. Such factors as local economic conditions should, no doubt, be considered and, under the statute, Wisconsin dealers are immune from unreasonable contract terms or the arbitrary, capricious, vengeful enforcement of those terms. Although we conclude that the trial judge went astray in discussing the phrase, "equities of [the] dealer," he nevertheless applied what we consider to be the proper test and, with respect to each finding, carefully analyzed the conduct of the parties to determine whether the contract terms were reasonable and whether their enforcement was equitable under the circumstances. We are therefore satisfied that the proper standards were in fact applied by the trial judge. We would, of course, agree with him that the term, "equity," should not relate merely to the quantum of venture capital in the enter-

prise. We are also satisfied that the trial court gave careful consideration to all of the "equities" listed in appellant's brief and which appellant claims were ignored.

The dealer claims that, in any event, the distributor waived its right to assert the contractual reasons for termination in that the distributor was aware of the dealer's failure to comply with the beneficial ownership requirements for at least a year and a half before the notice of termination was served. Reliance is placed upon Article 12 of the dealership agreement:

"In the event Distributor shall be entitled to terminate this Agreement pursuant to the provisions of this paragraph (1) of this Article 12, but shall fail to do so, such failure shall not be considered a waiver of the right of Distributor to so terminate this Agreement unless and until (a) six months shall have elapsed from the time Distributor obtains knowledge of the event entitling it to so terminate this Agreement. . . . Nevertheless, any event entitling Distributor to terminate this Agreement pursuant to the provisions of this paragraph (1) of this Article 12 may be considered at any subsequent time together with any subsequent events in determining Distributor's right to terminate this Agreement."

Dealer overlooks the fact that the particular breach referred to was not a one-shot violation of the contract but was a continual breach that remained unrectified for the entire life of the franchise. In addition, the other breaches—the failure to notify North Central of Toulon's discharge, the failure to meet the "cash and equivalent" requirements, and the failure to meet the obligations of its financing—continued until the time of termination. The purpose of Article 12 cited is to shield the dealer from the distributor's invocation of long-forgotten, isolated breaches in an unjustified and inequitable attempt to cancel the dealer's franchise. Equally, however, it protects a distributor from a dealer whose record shows a pattern of breaches over a period of more than six

months prior to the breach which triggered the cancellation. Under the provision, earlier breaches may be considered together with subsequent events that in themselves would authorize a termination. In the instant case, the dealer's record shows a series of violations up to the very time of the termination, and the most recent violations under the contract were properly used to revive persistent violations which had commenced more than six months previously. The trial judge correctly interpreted the contract in concluding that the distributor had not waived the earlier violations.

We conclude that the trial court properly found that the termination of the dealership was not unfair or without just provocation or without due regard to the equities of the dealer. We should point out, however, that the contract provides additional protection to a dealer whose dealership has been terminated. A settlement between the parties terminating their relationship is also subject to the standards of equity and fairness. There is an obligation on both parties and *particularly upon the distributor* to see to it that there be a fair and equitable settlement upon the termination of the contract.

*By the Court.*—Judgment affirmed.