George NAGY and Jo Ellyn Nagy
d/b/a A.F.I. Direct Service,
Plaintiffs,

v.

CUSTOM HOISTS, INC., Defendant.

Civ. A. No. 85–C–1581.

United States District Court,
E.D. Wisconsin.

March 7, 1986.

Joseph G. Murphy, South Milwaukee, Wis., for plaintiffs.

Brian C. Tyndall, Cook & Franke S.C., Milwaukee, Wis., for defendant.

## DECISION AND ORDER

REYNOLDS, Chief Judge.

The plaintiffs George Nagy and Jo Ellyn Nagy, d/b/a A.F.I. Direct Service, originally brought this suit in state court under the Wisconsin Fair Dealership Law, Wis.Stats. ¶ 135 ("WFDL"), to require the defendant Custom Hoists, Inc. to reinstate plaintiffs as dealers in defendant's products. On November 19, 1985, defendant removed the suit to this court pursuant to 28 U.S.C. § 1446 based on the diversity of the parties. Plaintiffs moved on December 12, 1985, for a preliminary injunction. Defendant moved for summary judgment on January 6, 1986. Both motions have been fully briefed. On February 13, 1986, the Court heard oral argument on plaintiffs' motion, which the Court is ready now to decide.

### FACTS

The plaintiffs George and Jo Ellyn Nagy are Wisconsin residents. On July 17, 1985, they purchased all the assets of an entity called A.F.I. Direct Service, Inc. ("AFI, Inc."), which was in the hydraulic cylinder repair business. Since that time the plaintiffs have operated their own hydraulic cylinder repair business under the name A.F.I. Direct Service ("AFI") with the assets they purchased from A.F.I. Direct Service, Inc.

One of the product lines that AFI, Inc. distributed at the time plaintiffs purchased the business was a line of cylinder components manufactured by defendant Custom Hoists, Inc., an Ohio corporation. Of AFI, Inc.'s customers, some 35% used defendant's parts. Plaintiffs admitted at oral argument that a company called Hyco, Inc. makes hydraulic cylinder parts which are fully interchangeable with defendant's. About the same percentage of AFI, Inc.'s customers used Hyco parts as used defendant's parts. Some of defendant's parts are interchangeable with those manufactured by a company called Heil, Inc. Another 27% of AFI, Inc.'s customers used Heil parts. Plaintiffs purchase Hyco parts from two Hyco distributors in Wisconsin; they are able to purchase Heil parts directly from Heil, Inc.

The plaintiffs acquired the business of AFI, Inc., for the sum of $124,000. The purchase agreement contains the following language.

A.F.I. Direct Service, Inc., ... assign[s] ... all rights to the use of the name of A.F.I. Direct Service, Inc. or any variant thereof; all tangible personal property;. parts inventory and work-in-progress; all business records; all sales accounts including all supporting documents, papers, files and records pertaining to said business and sales accounts and a complete customer list; all rights to the corporate telephone number(s); all contract rights; and any and all other rights associated with or arising out of the sale of hydraulic repair services by the corporation ...

Both the plaintiffs and AFI, Inc.'s president Sigmund Gralewicz, who sold AFI, Inc.'s business to the plaintiffs, assert that they intended by this language to assign to plaintiffs AFI, Inc.'s contract rights with respect to the defendant.

The late David Gralewicz, who preceded his father Sigmund Gralewicz as AFI, Inc.'s president, had been a dealer in defendant's goods for two periods of time. A written dealership agreement was in effect from March 20, 1979 until March 19, 1984, when the parties apparently agreed to terminate it. Provision 4(h) of that agreement prohibited assignment of the rights enjoyed under it by either party without the written consent of the other.

On April 11, 1984, defendant's vice-president for sales, Larry Briggs, wrote Gralewicz proposing a new agreement whereby AFI, Inc. and another Milwaukee area dealer, Advanced Hydraulics ("AH"), would both be granted non-exclusive dealerships. The letter read as follows.

Upon re-evaluation of your distributorship, we propose to keep A.F.I. Direct Service (sic) on line as an open distributor for the balance of this year. Since our visit in mid-March, we have had contact with a second company, who will also retain an open distributorship for

the balance of the year. With your acceptance of this program, both companies will represent Custom Hoists as distributors, without contracts, however will (sic) retain all rights of a distributor pertaining to parts and cylinder prices, literature and engineering support, and general back-up from the factory.

Our primary goal is to increase the overall volume from the Milwaukee area. We can only assume that one of the two companies will become the prime distributor at some point in the future. As you know, we look at a minimum volume of $10,000 in annual sales as the bottom line. We have given consideration to the economic conditions over the last few years, but business is picking up throughout the country, in both truck equipment and refuse equipment and these people use alot (sic) of cylinders.

We trust you understand our position in this matter. The second company involved is Advanced Hydraulics in Milwaukee...

If this arrangement is agreeable with you please sign and return the enclosed copy.

David Gralewicz of AFI, Inc. apparently accepted this offer.

Briggs, who negotiated the April 1984 dual dealership agreement with David Gralewicz, claims that their mutual understanding was that AFI, Inc. and AH, the second dealer, would compete for the remainder of 1984 to determine who should then be awarded the exclusive Custom Hoists distributorship in the Milwaukee area.

Briggs also sent a letter to the president of AH, the second dealer, on April 10, 1984, the day before his letter-offer to AFI, Inc.'s Gralewicz. This letter proposed to establish AH as a Custom "open" distributor for the remainder of the year and continued as follows.

Your company along with A.F.I. Direct Service will be competing for the Milwaukee area distributorship. Both companies will be re-evaluated at year end. The term, open distributor, simply means there will be no signed agreement with either company. Both will represent Custom Hoists as service distributors in the Milwaukee area, with all parts and replacement cylinders purchased at distributor prices. We will do our utmost to be supportive of your needs for parts, cylinders, literature or just assistance on applications. Your credit limit will be $5,000 against an open account.

The president of AH also apparently agreed to Briggs' offer. From April 1984 through September 1985 the defendant operated with two dealers in the Milwaukee area. By December 31, 1984, while both dealers easily exceeded the $10,000 annual sales minimum, AFI, Inc. had been outsold by the second dealer, AH. AFI, Inc. sold $27,593.15 worth of defendant's products; AH sold $30,626.45.

On February 2, 1985, David Gralewicz, president of AFI, Inc. and the person with whom Custom had dealt on the April 1984 dual distributorship agreement, died.

On April 29, 1985, Briggs wrote to Zigmund Gralewicz, who succeeded his son David as president of AFI, Inc., to inform him that defendant intended to terminate AFI, Inc.'s dealership in thirty days because AH had outsold AFI, Inc. On June 26, 1985, apparently on the advice of counsel, Briggs sent Gralewicz a "notice of termination" effective 90 days hence. The notice contained the following paragraph.

Section 135.04, Stats., requires a sixty (60) day period to rectify any claimed deficiencies only in those situations where the decision is based on a deficiency. In your situation, you have not met the reasonable dealership requirement of out-selling Advance Hydraulics within the time agreed. As the agreed time has expired, there is no period during which you can correct a "deficiency," and therefore, our business relationship will end on September 24, 1985.

By mid-August 1985, or about one month after plaintiffs purchased AFI, Inc., plaintiff George Nagy telephoned Larry Briggs of defendant Custom to inform him that

Nagy was willing to continue as a distributor of Custom products. Nagy was doing business at this time under the name A.F.I. Direct Service. Briggs told Nagy that Custom was in the process of terminating AFI, Inc., but that Custom would honor orders from Nagy that could be shipped through the end of the year.

Defendant's vice-president Briggs claims his company never gave Nagy permission to assume any contractual rights AFI, Inc. enjoyed with respect to Custom. Briggs claims he first learned that AFI, Inc.'s business had been sold on August 12, 1985, when he received a letter from the Nagys' attorney, Joseph G. Murphy.

On or about September 23, 1985, Custom received an order from Nagy. The order was unusually large and did not specify delivery dates. Custom regarded the order as unreasonable and returned it to plaintiffs unfilled on November 6, 1985.

## LEGAL ANALYSIS

The test for whether a district court should grant a preliminary injunction is well known. The Court must consider four factors.

(1) [W]hether the plaintiff has an adequate remedy at law or will be irreparably harmed if the injunction is not granted; (2) whether the injury threatened to plaintiff outweighs the harm defendant will suffer if the injunction is granted; (3) whether plaintiff has a reasonable likelihood of success on the merits; and (4) whether granting the injunction will disserve the public interest.

*Technical Pub. Co. v. Lebhar-Friedman, Inc.,* 729 F.2d 1136, 1138 (7th Cir.1984). Judge Posner of the United States Court of Appeals for the Seventh Circuit has usefully summarized this and other variants of the four-factor test in two recent cases, *Roland Machinery v. Dresser Industries,* 749 F.2d 380 (7th Cir.1984), and *American Hospital Supply Corporation v. Hospital Products Limited,* 780 F.2d 589 (7th Cir. 1986), which this Court follows in the analysis below.

In deciding whether to grant or deny a preliminary injunction a district court must seek to minimize errors. *Roland Machinery,* 749 F.2d at 388. This concern for the possibility of error stems from the fact that such decisions are made on the basis of an incomplete record. A mistaken decision can cause irreparable harm to either plaintiff or defendant. To avoid such a mistake a court must use the single most effective tool it has, its own practiced judgment regarding the legal and factual merits of the plaintiff's claim. The court must, therefore, consider the balance of irreparable harm in the light of the probability that the plaintiff will succeed on the merits. Judge Posner has restated this principle as an economist's rule of thumb against judicial error.

These mistakes can be compared, and the one likely to be less costly can be selected, with the help of a simple formula: grant the preliminary injunction if but only if $P \times H_p > (1-P) \times H_p$, or, in words, only if the harm to the plaintiff if the injunction is denied, multiplied by the probability that the denial would be an error (that the plaintiff, in other words, will win at trial), exceeds the harm to the defendant if the injunction is granted, multiplied by the probability that granting the injunction would by an error. That probability is simply one minus the probability that the plaintiff will win at trial; for if the plaintiff has, say, a 40 percent chance of winning, the defendant must have a 60 percent chance of winning $(1.00 - .40 = .60)$. The left-hand side of the formula is simply the probability of an erroneous denial weighted by the cost of denial to plaintiff, and right-hand side simply the probability of an erroneous grant weighted by the cost of the grant to the defendant.

*American Hospital Supply,* 780 F.2d at 593. Any harm the public interest might suffer due to the court's error is to be added to "$H_p$" or "$H_p$" as the case may be. *Id.*

The Court does not regard this restatement of the four-factor test as requiring an impossible mathematical precision in the

findings of fact and conclusions of law to be made at this early stage of litigation. I read Judge Posner's formula rather as an attempt to clarify conceptually the district court's technique in deciding motions for preliminary injunctions. As such the Court finds it to be helpful. Restating the four-factor test in this way has at least one cardinal virtue; it requires the Court to consider each factor of the test rather than to hang the parties' fate on just one or another of them. Under this test it would no longer seem adequate, if ever it was, for a district court merely to announce that it "finds" irreparable injury, or a likelihood of success, without also assessing how substantial these factors are. *See Dresser*, 749 F.2d at 387. This is the least a court can do when, as is often the case, it must dispose of a litigant's liberty and property without the benefit of a fully developed factual record.

Applying this test to the case at hand, the Court finds that the irreparable harm which plaintiffs would suffer from an erroneous denial of a preliminary injunction is off-set by the irreparable harm which defendant would suffer from an erroneous grant of an injunction, that the probability that plaintiffs would succeed at trial on the merits is small, and that the public's interest has not been shown to align with either party's. The Court must, therefore, deny plaintiffs' motion for a preliminary injunction.

## A. *Irreparable Harm to Plaintiff*

Wis.Stats. § 135.065 excuses the plaintiffs from having to show irreparable injury if they can show that defendant has violated chapter 135. As the Court will discuss below, it is unclear whether such a violation has taken place because it is doubtful that plaintiffs have a validly assigned dealership. Nevertheless, at the risk of embarking on a premature assessment of the probability of plaintiffs' success on the merits, the Court will assume that the plaintiffs are covered by the WFDL so as to determine whether they can show a violation of chapter 135 for the purposes of § 135.065.

The plaintiffs argue that the June 26, 1985, notice which defendant sent to AFI, Inc. failed to comply with the requirements of § 135.04 because it did not provide AFI, Inc. and plaintiffs with a 60–day cure period. Defendant argues in reply that a dealership grantor may terminate a dealer on 90-days' notice alone, without providing a 60–day cure period, when the decision to terminate is not based on a deficiency, *Designs in Medicine, Inc. v. Xomed, Inc.*, 522 F.Supp. 1054, 1060 (E.D.Wis.1981), and that its termination of plaintiffs' predecessors was not based on a curable deficiency. Termination here, defendant argues, was for "good cause," namely, the failure of AFI, Inc. to comply with a reasonable, non-discriminatory requirement which defendant imposed in order to stay competitive in the Milwaukee market. *Remus v. Amoco Oil Co.*, 611 F.Supp. 885, 887 (E.D.Wis. 1985).

The Court finds that the June 26, 1985, termination notice did not comply with the requirements of § 135.04 and that the plaintiffs are, therefore, excused from making any further showing of irreparable injury. It would seem disingenuous to deny that defendant terminated AFI, Inc. for a deficiency in AFI, Inc.'s sales of defendant's products. AFI, Inc. failed to outsell AH in 1984, and defendant apparently regarded success in this competition as a prerequisite to renewal of AFI, Inc.'s dealership, assuming it had one after April 11, 1984.

Granted, AFI, Inc.'s deficiency was not curable by the time defendant notified AFI, Inc. of defendant's intent to terminate. But § 135.04 makes no distinction between curable and non-curable deficiencies. It is reasonable to conclude, therefore, that the WFDL does not provide for dealership termination on the basis of a non-curable deficiency of this kind. Section 135.02's definition of "good cause" does not permit the termination of dealerships merely because a grantor can obtain an increased profit margin by replacing the dealers who have

established its good will in a market. *See Kealey Pharmacy v. Walgreen Co.*, 761 F.2d 345, 350 (7th Cir.1985). Therefore, again assuming that AFI, Inc. had a dealership after April 11, 1984, defendant could not refuse to renew it based on AFI, Inc.'s failure in a sales contest. The plaintiffs have provisionally shown a violation of chapter 135 and, thus, irreparable harm within the meaning of § 135.065.

Under the *American Hospital Supply/Dresser* approach the law of preliminary injunctions Plaintiffs apparently must show that their remedy at law would be inadequate, even though they enjoy a statutory exclusion from having to show irreparable harm. *Dresser*, 749 F.2d at 386. The Court confesses it is somewhat perplexed by this requirement. In many instances the legislature's purpose may be frustrated by requiring a plaintiff to show what the statute requires the court to presume true across the board. Granted, "irreparable harm" and harm for which there is "no adequate remedy at law" are different things, but I would have thought that the former is a subset of the latter, and that anyone, therefore, who enjoys a statutory presumption of irreparable harm ought to enjoy it as to the inadequacy of his legal remedy as well. In any event, plaintiffs in this case are able to show that their legal remedy would be inadequate.

Because plaintiffs are wholly inexperienced in managing a business, there is no way to determine how they would perform today as full-fledged dealers in defendant's products. It would be virtually impossible to determine at the conclusion of trial the extent to which any decrease in their business up to that time would have been due to their inexperienced management rather than defendant's failure to renew AFI, Inc.'s dealership, or on the other hand, whether or not plaintiffs had significantly mitigated their damages. A damages award, therefore, would be extremely speculative.

## B. *Balance of Harm*

Although the WFDL's statutory presumption of irreparable harm exempts plaintiffs from having to show it as a threshold requirement for a preliminary injunction, the Court must, nevertheless, consider the extent of such harm in order to balance it against any irreparable harm to the defendant. The Court finds that the irreparable harm plaintiffs would suffer from an erroneous denial of a preliminary injunction would be no more than defendant would suffer were the injunction erroneously granted.

The plaintiffs have not alleged that they are any less well able to cover the 35% of their customers who use defendant's hydraulic cylinders than were AFI, Inc. before them. Neither plaintiffs nor defendant has made any allegation as to whether AFI, Inc. was, or plaintiffs are now, dealers in Hyco parts, which are interchangeable with defendant's. But the fact that AFI, Inc. had just as many customers who used Hyco parts as used defendant's parts suggests that AFI, Inc. was able to buy and install Hyco cylinders at some profit. It would seem, therefore, that plaintiffs may be able to keep and profitably serve all the customers for whom they formerly installed defendant's parts by using Hyco replacement parts. There is no evidence whether the profit margin AFI, Inc. enjoyed on its work for its Hyco customers would sustain plaintiffs' business if all plaintiffs' Custom customers became Hyco customers. Nevertheless, the Court cannot conclude on the available evidence that the survival of plaintiffs' business is at stake. The Court finds, rather, that the plaintiffs risk a moderate amount of irreparable harm.

The Court must balance against the harm the plaintiffs would suffer from an erroneous denial of a preliminary injunction the irreparable harm, if any, defendant would suffer from an erroneous grant of an injunction. *Dresser*, 749 F.2d at 387. The irreparable harm defendant alleges it would suffer were the injunction granted is the damage which would be done to its relationship with AH, currently its exclusive Milwaukee area dealer, and the possi-

ble loss of its good will due to having an inexperienced dealer serving some of its Milwaukee area customers. I find that such harm roughly balances the harm plaintiffs would suffer were the injunction denied.

## C. *Plaintiffs' Probability of Success*

The threshold issue in this case is whether the purported assignment to plaintiffs of any WFDL rights enjoyed by AFI, Inc. was valid. This is a question of first impression. Though this is not a case of successor liability but rather a case where a successor seeks to assert his predecessor's alleged rights, successor liability law provides useful analogies.

WFDL dealers, dealership grantors, and their assignees are subject to Wisconsin's general rule against successor liability. *Wine Imports of America. Ltd. v. Gerolmo's Liquors,* 563 F.Supp. 163, 167 (E.D. Wis.1983). That rule is set forth in *Leannais v. Cincinnati, Incorporated,* 565 F.2d 437, 439 (7th Cir.1977).

> The general rule in the majority of American jurisdictions, including Wisconsin, is that a corporation which purchases the assets of another corporation does not succeed to the liabilities of the selling corporation ... There are, however, four well-recognized exceptions to the general rule under which liability may be imposed on a purchasing corporation: (1) when the purchasing corporation expressly or impliedly agreed to assume the selling corporation's liability; (2) when the transaction amounts to a consolidation or merger of the purchaser and seller corporations; (3) when the purchaser corporation is merely a continuation of the seller corporation; or (4) when the transaction is entered into fraudulently to escape liability for such obligations.

*Leannais,* 565 F.2d at 439.

Plaintiffs claim that this case falls under the first and third exceptions to the *Leannais* rule. In analyzing the application of these exceptions to this case, the weakness of the analogy to successor liability cases becomes apparent.

This is a case of the attempted express assignment not of an obligation but of a right. The obligation corresponding to that right falls neither on a party to the assignment nor, the evidence shows, on one who consented to assignment. While it may be reasonable in most circumstances to enforce an obligation, freely assumed by a party who later becomes reluctant to fulfill it, nevertheless it seems unfair to hold a third party liable, against the general rule, merely because two other parties "expressly or impliedly" assigned the right to receive his performance.

The third exception to the *Leannais* rule is inapplicable to this case. The managers with whom defendant had a dealership agreement are no longer employed by plaintiffs. Identity of those who manage and control is a key to the kind of business continuity with which this exception is concerned. *See Fish v. Amsted Industries, Inc.,* 126 Wis.2d 293, 302, 376 N.W.2d 820 (1985).

The application to a WFDL case of exceptions analogous to those in successor liability law would be inappropriate because there is a strong personal service element to a dealership agreement. Dealership grantors contemplating the establishment of a Wisconsin dealership have a strong incentive to consider carefully the character and business skills of prospective dealers, in light of the protection which the WFDL affords to the ensuing long-term relationship. Wisconsin courts recognize the importance of this personal services aspect of dealership and franchise agreements. *See Nagle Motors v. Volkswagen N.C. Distributor,* 51 Wis.2d 413, 424–26, 187 N.W.2d 374 (1971). To allow the free assignment of dealerships would in many cases unjustly deprive dealership grantors of a benefit of their bargains with grantees, namely, the assurance that their dealers possess adequate business qualifications.

The evidence in this case apparently will show that the defendant selected AFI, Inc.

as its Wisconsin dealer in part because of the future prospects and experience of the son and father management team of David and Zigmund Gralewicz. The original written agreement between defendant and AFI, Inc. specified the personal services that the dealership grantees were obliged to provide and prohibited both parties from assigning their rights under the agreement without the written consent of the other. The plaintiffs on the other hand appear to have had no previous experience managing a business. Under these circumstances it would be unfair to defendant to allow assignment of the alleged dealership.

Even were this Court to find the assignment valid there would be a serious question whether AFI, Inc. was still a dealer at the time the alleged assignment took place. Plaintiffs conceded at oral argument that the original dealership agreement was mutually terminated by defendant and AFI, Inc. on March 19, 1984. It is unclear whether the April 11, 1984, letter agreement granted a new temporary dealership, which the defendant was bound to renew absent good cause, or merely initiated a process whereby a new dealership was ultimately awarded to Advanced Hydraulics, the second "open distributor" mentioned in the letter. Because the letter is ambiguous, some kinds of parole evidence would probably be admissible to prove its disputed terms. The Court has little indication at this point what such evidence would show, but it may be significant that the April 10, 1984, letter written by defendant's Larry Briggs to the president of AH unambiguously states that AH is to compete with AFI, Inc. for defendant's Milwaukee area distributorship.

The overall probability that plaintiffs will succeed at trial on the merits, then, is rather low.

D. *The Public Interest*

Neither party has demonstrated to the Court how the public's interest would be significantly promoted either by the grant or denial of a preliminary injunction in this case.

In conclusion, the Court finds that although the irreparable harm plaintiffs are likely to suffer due to an erroneous denial of an injunction is about evenly balanced with the irreparable harm defendant is likely to suffer from an erroneous grant of an injunction, the plaintiffs have a lower probability of success at trial on the merits. Weighing the public's interest does not alter this balance against the plaintiffs, and the Court must, therefore, deny plaintiffs' motion for a preliminary injunction.

## ORDER

IT IS THEREFORE ORDERED that the motion for a preliminary injunction of plaintiffs George and Jo Ellyn Nagy d/b/a A.F.I. Direct Service is hereby denied.