FORD MOTOR COMPANY, a Delaware corporation, Plaintiff-Respondent and Cross-Appellant,†

v.

ROBERT L. LYONS, an individual; Kenosha Lincoln-Mercury Ford, Inc., a Wisconsin corporation; Milwaukee Rental Cars, Inc., a Delaware corporation; Green Bay Rental Cars, Inc., a Wisconsin corporation; United Leasing & Financial Services, Inc., a Wisconsin corporation; and United Rent-A-Car, Inc., a New Jersey corporation, Defendants and Third-Party Plaintiffs-Appellants and Cross-Respondents,†

UNITED GENERAL LEASING SERVICE, INC., a Wisconsin corporation; Milwaukee Car Lease, Inc., a Wisconsin corporation; United Leasing Services, Inc., a Delaware corporation; and Wausau Car Rentals, Inc., a Wisconsin corporation, Intervening Counter-Claimants and Third-Party Plaintiffs-Appellants and Cross-Respondents,

FORD MOTOR CREDIT COMPANY, a foreign corporation, Third-Party Defendant-Respondent and Cross-Appellant.

† Petition to review denied.

Court of Appeals

*No. 84-587. Argued July 31, 1986.—Decided February 4, 1987.*

(Also reported in 405 N.W.2d 354.)

398

399

401

404

405

407

On behalf of the defendants and third-party plaintiffs-appellants and cross-respondents, intervening counter-claimants and third-party plaintiffs-appellants and cross-respondents briefs were filed by *Randall J. Sandfort* of *Terwilliger, Wakeen, Piehler & Conway, S.C.* of Wausau. Oral argument by *Mr. Sandfort.*

On behalf of the plaintiff-respondent and cross-appellant, third-party defendant-respondent and cross-appellant briefs were filed by *David J. Cannon, John A. Busch,* and *Charles P. Graupner,* of *Michael, Best & Friedrich* of Milwaukee. Oral argument by *Mr. Cannon.*

Before Scott, C.J., Brown, P.J., and Nettesheim, J.

NETTESHEIM, J. Robert Lyons and his various corporations engaged in the sale, lease and rental of motor vehicles and related services appeal from certain portions of a judgment of the circuit court based on a jury verdict finding them liable for breaches of contract and fraudulent practices committed during their business dealings with the Ford Motor Company (Ford) and the Ford Motor Credit Company (Ford Credit).[1] Ford and Ford Credit cross-appeal from

---

[1] The parties engaged in oral argument before this court on July 31, 1986.

certain portions of the judgment based on the verdict finding them liable for their misconduct towards Lyons and his corporations. The issues raised in this appeal are too numerous and complex to recite here. Instead, we rely on the section headings to guide the reader through this appellate maze.

We initially conclude that the trial court lost jurisdiction to decide the parties' motions after verdict. Therefore, under sec. 805.16, Stats., all motions after verdict are deemed denied and we review them from this perspective. We affirm the judgment in part, reverse the judgment in part and remand for further proceedings consistent with this opinion.

As a preliminary matter, we note that this case represents one of the longest and most complex jury trials in Wisconsin legal history. The trial began on August 2, 1982 based upon pleadings alleging over 300 causes of action. Several hundred exhibits were received into evidence. The evidentiary phase of the trial lasted over seven months. The jury deliberated more than three weeks on the 103-question special verdict. On appeal, the transcript of the proceedings is over 8000 pages and the parties' briefs and supporting papers number over 1200 pages.[2]

[2]Counsel for Lyons unilaterally filed two separate appellants' briefs totaling 199 pages, 140 pages in excess of the permitted length. In addition, Lyons' counsel filed an "Abridgement Of The Evidence," a 293-page document which is not recognized by our rules. When these violations were brought to counsel's attention, he requested permission to have the documents accepted. We granted the request, noting, however, that a violation of the rules had occurred and reserving to a later point in time a ruling as to appropriate sanction.

While some increase in the normal briefing page limits was warranted given the volume of material and complexity of the

Because the appellants are numerous and present a complex network of corporate interrelationships, this opinion will refer to them simply as "Lyons" or the "dealership" since these two entities raise most of the issues on appeal. If the context otherwise requires reference to another appellant, the opinion will do so.

The relationship between Kenosha Lincoln-Mercury Ford (dealership)[3] and Ford and Ford Credit is based in contract. The dealership was a franchisee of Ford and, as such, entered into a Sales and Service Agreement (SSA) with Ford. Ford Credit provided the financing for the dealership under a Floor Plan Financing Agreement (FPFA). Under a power of attorney executed by the dealership in conjunction with the FPFA, Ford Credit would pay Ford for vehicles sent to the dealership. In return, the dealership would pay a monthly interest charge and, after a vehicle was sold, the invoice price to Ford Credit. Ford Credit maintained a security interest in the dealership's vehicles held out for retail sale.

In addition, the dealership contracted with Ford under a Lincoln-Mercury Dealer Daily Rental Con-

issues in this case, we nonetheless conclude that the extent of the materials was exorbitant. The 293-page "Abridgement Of The Evidence," for instance, is essentially an argument of the facts— an exercise which counsel was able to condense in his appellants' brief to 92 pages. As a result, the discussion of many of the issues tended to become a rehash of the entire litany of the perceived wrongs visited upon Lyons (whether real or imagined) rather than a crisp and precise discussion of the relevant facts and law. This also was part of the problem which pervaded the trial of this case below. Thus, our accommodation to counsel, rather than easing our task on appeal, actually unduly complicated it. An appropriate sanction by separate order will follow.

[3]Portions of the record also refer to the dealership as Jack White Lincoln-Mercury.

tract (LMDDR) and a Ford Rent-A-Car System Agreement (FRAC) which allowed it to rent Ford and Lincoln-Mercury automobiles on a daily basis. The dealership also entered into a Ford Authorized Leasing Systems Agreement (FALS) and a Lincoln-Mercury Dealer Leasing Association Agreement (LMDLA) allowing it to lease Ford and Lincoln-Mercury motor vehicles.

United Leasing and Financial Services, Milwaukee Rental Cars, Green Bay Rental Cars, United Rent-A-Car and Wausau Car Rentals were all Budget Rent-A-Car franchises which held assignments of the dealership's LMDDR. United Leasing and Financial Services also held assignments of the dealership's FRAC and FALS. United General Leasing and United Leasing Services were both leasing entities holding a LMDLA. In addition, United Leasing Services held a FALS and FRAC with Ford. At the times critical to this litigation, Lyons held a controlling interest in all of these corporations.

Following the dealership's and the Budget companies' failure to make the required payments under the LMDDR, Ford canceled this contract with the dealership on May 2, 1980. On May 15, 1980, the dealership responded by terminating the SSA and all other agreements with Ford and Ford Credit. Subsequently, the dealership voluntarily turned over the floor plan vehicles to Ford Credit. Ford Credit, in turn, either sold the vehicles directly to other dealerships or auctioned them off. The dealership also transferred possession of more than 400 Budget vehicles to Ford. Ford, in turn, rented 120 of the vehicles to the Chicago Budget franchise for six months. Ford also sold the vehicles at auction. Ultimately, Ford claimed to have lost $330,000 on the sale of these vehicles.

On May 30, 1980, this action was commenced by Ford as a replevin proceeding to recover the Ford vehicles leased to the dealership and assigned to United Leasing and Financial Services and Milwaukee Rental Cars. Lyons, the dealership, Milwaukee Rental Cars and other corporate defendants counterclaimed against Ford. In addition, certain of Lyons' corporations filed a third party complaint against Ford Credit. The counterclaim included allegations that Ford violated sec. 218.01, Stats., by canceling the dealership's car rental franchise, coercing the dealership's acceptance of unordered vehicles and engaging in unconscionable and unfair acts. The counterclaim and third party complaint included allegations that Ford and Ford Credit acted in bad faith and conspired to put the dealership out of business. Ford then amended its original complaint to include claims that Lyons and certain of his corporations had engaged in tortious conduct and breached contractual duties owed to Ford. Ford Credit also claimed that the dealership had breached the FPFA.

On March 3, 1983, the jury returned a verdict finding that the dealership breached the FPFA with Ford Credit but that Ford Credit sold the repossessed vehicles in a commercially unreasonable manner. In addition, the jury awarded Ford damages for amounts owed by the dealership under the SSA and FRAC. The jury also found that the dealership fraudulently released obligations owed to it by the rental and leasing companies so as to deprive Ford of the money owed to it, that the dealership breached the SSA with Ford, that when Ford terminated the LMDDR it was owed $474,061.93 and that Ford sold the repossessed Budget vehicles in a commercially unreasonable manner.

The jury also found that Ford and Ford Credit had engaged in unconscionable practices in violation of ch. 218, Stats.; coerced the dealership's acceptance of unordered vehicles; acted in bad faith; conspired to injure Lyons, the dealership, United Leasing Services and United Leasing and Financial Services; and breached contracts with Lyons and his corporations in various manners. The jury's findings will be explained in greater detail where necessary to a discussion of specific issues.

On May 2, 1983, the sixtieth day after the jury's verdict, the trial court heard the parties' motions after verdict. On May 26, before the expiration of the statutory time for deciding motions after verdict, the court enlarged the time in which to render a decision to June 8, 1983, pursuant to sec. 801.15(2)(b), Stats. Subsequently, the court enlarged the time for making a decision several more times until a decision was rendered in segments on September 20, September 30, October 24, 1983 and February 21, 1984. The net effect of the jury's verdict and the trial court's rulings on the motions after verdict was a judgment in favor of Ford and against certain of Lyons' corporations in the amount of $416,574.57 and a judgment in favor of Ford Credit and against Lyons personally and certain of his corporations in the amount of $165,623.41.

## I. WAIVER

Initially, we turn to several issues raised at the conclusion of Lyons' brief which we deem waived because they were not raised in the motions after verdict. Specifically, Lyons alleges error in the trial court's ruling that the counterclaim and cross-complaint causes of action for economic duress, fraud,

contribution and indemnification were inappropriate. In addition, Lyons appeals the trial court's ruling that only the dealership had standing to sue under the federal Automobile Dealer's Day in Court Act, 15 U.S.C. §§ 1221–25 (1982). Lyons also alleges error in certain of the trial court's procedures, rulings and verdict formation.

██

Ford and Ford Credit object to Lyons' inclusion of these issues on appeal which were not made part of the motions after verdict. "Motions after verdict must state with particularity the alleged error so as to apprise the trial court of the alleged error and give it an opportunity to correct it, thereby avoiding a costly and time consuming appeal." *Calero v. Del Chem. Corp.,* 68 Wis. 2d 487, 497, 228 N.W.2d 737, 743 (1975) (quoting *Kobelinski v. Milwaukee & Suburban Transp. Corp.,* 56 Wis. 2d 504, 517, 202 N.W.2d 415, 423 (1972)). It is also clear that the failure to include alleged errors in the motions after verdict constitutes a waiver of the errors. *Id.* at 497, 228 N.W.2d at 743–44. This rule applies where a proper objection is made during the course of trial, but the error is not included in the motions after verdict. *See Roach v. Keane,* 73 Wis. 2d 524, 535–36, 243 N.W.2d 508, 515 (1976).

██

Lyons does not deny the failure to raise these matters by motion after verdict, but, instead, notes that the waiver rule is purely one of administration and that we should exercise our discretion to reach questions of law which we would otherwise deem waived. *See Wirth v. Ehly,* 93 Wis. 2d 433, 443–44, 287 N.W.2d 140, 145–46 (1980). We also note that we have the discretion to reach issues in the interest of justice which would normally be deemed waived. *See* sec.

752.35, Stats. However, such action is not to be taken by us unless we are convinced, on the record as a whole, that there has been a probable miscarriage of justice. *Sentell v. Higby,* 87 Wis. 2d 44, 50, 273 N.W.2d 780, 783 (Ct. App. 1978). Because of the unclear factual basis for the disputed causes of action and the questionable merit of the other issues, we are unable to conclude that justice has miscarried. Therefore, we decline to exercise our discretion to reach these issues.

## II. COMPETENCE TO EXERCISE JURISDICTION OVER THE PARTIES' MOTIONS AFTER VERDICT

Lyons argues that the trial court lost jurisdiction to decide the parties' motions after verdict by consecutively extending the time for its decision under sec. 801.15(2)(b), Stats. We agree.

Section 805.16, Stats. (1981–82), provided in relevant part:

> Upon rendition of verdict, the judge shall in open court set dates for serving and filing motions and briefs and for arguing motions. ... The dates for hearing arguments on motions shall be not less than 10 nor more than 60 days after verdict. If an order granting or denying a motion challenging the sufficiency of evidence or for a new trial is not entered within 90 days after verdict, the motion shall be deemed denied.[4]

---

[4]Section 805.16, Stats., currently provides:

Motions after verdict shall be filed and served within 20 days after the verdict is rendered. The dates for hearing arguments on motions shall be not less than 10 nor more than 60 days after verdict. If an order granting or denying a motion challenging the sufficiency of evidence or for a new trial is not entered within 90 days after verdict, the motion shall be deemed denied. Notwith-

Section 801.15(2)(b), Stats., provides:

> The time within which a motion challenging the sufficiency of the evidence or for a new trial must be decided shall not be enlarged except for good cause. The order of extension must be made prior to the expiration of the initial decision period.

Lyons argues that sec. 801.15(2)(b), Stats., allows only a single initial extension of the time limit for a trial court decision and that such extension must be entered prior to the expiration of the initial time period and then only upon a showing of good cause.

The meaning of a statute is a question of law which we will decide independently of the trial court's conclusion. *State v. Denter*, 121 Wis. 2d 118, 122, 357 N.W.2d 555, 557 (1984). The primary source of construction is the language of the statute itself. *Id.* at 123, 357 N.W.2d at 557. External aids to construction are used only to determine the meaning of an ambiguous statute. *See State v. Tollefson*, 85 Wis. 2d 162, 167, 270 N.W.2d 201, 203 (1978). The statute is ambiguous only if reasonably well-informed persons could construe it in two different ways. *Kollasch v. Adamany*, 104 Wis. 2d 552, 561, 313 N.W.2d 47, 51–52 (1981).

standing the foregoing, a motion for a new trial based on newly discovered evidence may be made at any time within one year after verdict. Unless an order granting or denying the motion is entered within 30 days after hearing, the motion shall be deemed denied.

The purpose of the change was to eliminate the previous statute's encouragement of frivolous motions which caused unnecessary hearings. *See* Judicial Council Note, 118 Wis. 2d xiii, xiv (1984). This change does not affect our disposition of this case.

419

The parties agree that sec. 801.15(2)(b), Stats., unambiguously provides that an extension order must be entered prior to the expiration of the initial decision period. From this it logically follows that any subsequent extension orders would, of necessity, be entered beyond the initial decision period. Therefore, once the initial decision period expires, the opportunity for any further extension is lost. This is precisely what occurred in this case. Therefore, the trial court lost competency to exercise jurisdiction in this matter.

Even if we were to conclude that the language of sec. 801.15(2)(b), Stats., is ambiguous, the rules of statutory construction support our conclusion that only a single extension is contemplated under the statute. When determining the meaning of an ambiguous statute, we employ judicial rules of statutory construction to ascertain the intention of the legislature. *See Tollefson,* 85 Wis. 2d at 167, 270 N.W.2d at 203. We look to the statutory context, subject matter, scope, history and object to be accomplished. *Warren v. Link Farms, Inc.,* 123 Wis. 2d 485, 488, 368 N.W.2d 688, 690 (Ct. App. 1985). We search for a reasonable meaning. *Id.* at 489, 368 N.W.2d at 690.

The importance of the time limit for ordering a new trial has been stressed by the supreme court in *Anderson v. Eggert,* 234 Wis. 348, 354, 291 N.W. 365, 368 (1940):

> So important a statutory provision ... should be carefully complied with. It was enacted by the legislature for the purpose of requiring courts in the interest of a sound public policy to administer justice "promptly and without delay" in accordance with the constitutional mandate.

In fact, sec. 801.15(2)(b), Stats., was "designed to foster the speedy resolution of motions after verdict." Judicial Council Committee's Note—1974, Wis. Stat. Ann. § 801.15 (West 1977). *See also* Clausen and Lowe, *The New Wisconsin Rules of Civil Procedure Chapters 801–803,* 59 Marq. L. Rev. 1, 29 (1976). Moreover, our strict construction of sec. 801.15(2)(b) complies with this court's construction of other portions of sec. 801.15(2). *See Brookhouse v. State Farm Mut. Auto. Ins. Co.,* 130 Wis. 2d 166, 387 N.W.2d 82 (Ct. App. 1986) (contruing sec. 801.15(2)(a) and (c)).[5]

Before leaving this issue, we note that the parties and the trial court addressed this issue solely under the provisions of sec. 801.15(2)(b), Stats. We have similarly limited our consideration of this issue in this opinion. We observe, however, to the extent that certain of the motions after verdict qualify under subsec. (2)(c) of the statute, our holding would be the same since this portion of the statute forbids any enlargement of time.

## III. MOTIONS AFTER VERDICT RULINGS REVIEWED IN THE INTEREST OF JUSTICE

An order disposing of motions after verdict entered after the expiration of the enlargement of the

---

[5]We acknowledge that our conclusion on this issue is in conflict with statements made in our earlier orders denying Lyons' motion for summary reversal on essentially the same grounds. These statements, if not improvident, at least should have been couched in terms which would have denied the motion but reserved our right to address the issue anew in this appeal. We observe, however, that the motion for summary reversal was nonetheless correct in light of the numerous other issues in this case which did not warrant summary reversal.

initial decision period, like an order entered after the expiration of the initial decision period without an enlargement, renders the order void because the trial court has lost competency to exercise its jurisdiction. *See Jos. P. Jansen Co. v. Milwaukee Area Dist. Bd.,* 105 Wis. 2d 1, 10, 312 N.W.2d 813, 817 (1981). However, where an order for a new trial has been declared void for failure to comply with the time limit for its entry, we are not precluded from invoking our power under sec. 752.35, Stats., in the interest of justice "to accomplish the same result that the trial court attempted to accomplish but was unable to because of its loss of the capacity to exercise jurisdiction." *Id. See also Dupler v. Seubert,* 69 Wis. 2d 373, 381, 230 N.W.2d 626, 631 (1975).

We will invoke our discretion under sec. 752.35, Stats., only where we are convinced that there has been a probable miscarriage of justice if the jury's verdict were permitted to stand. *Jansen,* 105 Wis. 2d at 12, 312 N.W.2d at 818. A probable miscarriage of justice exists only if the evidence and law are such that the defendants probably should have won and therefore deserve another chance, *Sentell,* 87 Wis. 2d at 50, 273 N.W.2d at 783, or if errors during the trial deprive the defendants of a fair and full trial of all the issues of the case, *Air Wis., Inc. v. North Cent. Airlines, Inc.,* 98 Wis. 2d 301, 318, 296 N.W.2d 749, 756 (1980).

Because the trial court lost competency to address the motions after verdict, all such motions are deemed denied pursuant to sec. 805.16, Stats. As to those motions after verdict which the trial court, in any event, denied, we will review these rulings which are appealed as we would in any conventional appeal.

However, as to those rulings which changed the jury's verdict, we choose, under *Jansen,* to address only the following issues in the interest of justice:

## A. *Tort of Bad Faith*

The jury found that Ford acted in bad faith against the dealership, United Leasing and Financial Services, Milwaukee Rental Cars, United Leasing Services, Wausau Car Rentals, Green Bay Rental Cars and United Rent-A-Car. Damages in varying amounts totaling $569,678.43 were awarded to these parties. Additionally, the jury found that Ford Credit acted in bad faith against Lyons, the dealership, United Leasing Services and United Leasing and Financial Services. However, the jury did not award any damages against Ford Credit.

Ford argued, in support of its motions after verdict, that Wisconsin law does not recognize the tort of bad faith in a dealership setting and therefore Lyons does not have a bad faith cause of action. The trial court vacated these jury findings and awards as to every claimant except the dealership. The jury awarded the dealership $113,765.30 for Ford's bad faith.

The parties do not dispute that the tort of bad faith has, to date, been recognized only in insurance cases in Wisconsin. *See Anderson v. Continental Ins. Co.,* 85 Wis. 2d 675, 692, 271 N.W.2d 368, 377 (1978). The tort of bad faith in insurance cases does not involve a tortious breach of contract, but rather arises out of the breach of a fiduciary duty owed by an insurer to its insured resulting from the relationship created by the insurance contract. *Kranzush v. Badger*

*State Mut. Casualty Co.,* 103 Wis. 2d 56, 62, 307 N.W.2d 256, 260 (1981). "[T]here must be a duty existing independently of the performance of the contract for a cause of action in tort to exist." *Landwehr v. Citizens Trust Co.,* 110 Wis. 2d 716, 723, 329 N.W.2d 411, 414 (1983). *See also Dvorak v. Pluswood Wis., Inc.,* 121 Wis. 2d 218, 220–21, 358 N.W.2d 544, 546 (Ct. App. 1984).

Lyons argues that the state and federal statutory recognition of the economic disparity between automobile manufacturers and their dealers supports the conclusion that Ford and Ford Credit stand in a fiduciary relationship with Lyons and his corporations. *See* sec. 218.01, Stats.; 15 U.S.C. §§ 1221–25 (1982) (Automobile Dealer's Day in Court Act). This argument, however, skirts the true issue before us concerning the existence of a separate cause of action for the tort of bad faith. This legislation does not create the fiduciary relationship necessary to support a separate cause of action for the tort of bad faith. Rather, the acts create new statutory causes of action. In this case, the causes of action created by these acts were presented to the jury along with a separate cause of action for the tort of bad faith.

The primary issue before us is whether we should extend judicial recognition of the tort of bad faith beyond the insurance setting to the facts of this case. We decline. In the insurance line of cases, the insured has bartered:

> "to the insurance company all of the rights possessed by him to enable him to discover the extent of the injury and to protect himself as best he can from the consequences of the injury. He has contracted with the insurer that it shall have the

exclusive right to settle or compromise the claim, to conduct the defense, and that he will not interfere except at his own cost and expense."

*Anderson,* 85 Wis. 2d at 688, 271 N.W.2d at 375 (quoting *Hilker v. Western Auto. Ins. Co.,* 204 Wis. 1, 231 N.W. 257 (1930), *aff'd on rehearing,* 204 Wis. 12, 14, 235 N.W. 413, 414 (1931)). Lyons has not bartered away any rights of the same stature as those contracted away in the insurance setting.[6]

Moreover, as a court of appeals, we are reluctant to create a bad faith cause of action in this case. *See Holloway v. K-Mart Corp.,* 113 Wis. 2d 143, 148, 334 N.W.2d 570, 573 (Ct. App. 1983). "Such an exception is more appropriately created by the supreme court, in

[6]Lyons argues that a fiduciary relationship existed as a result of a power of attorney executed by the dealership giving Ford Credit the power to deliver directly to Ford "promissory notes and other evidences of indebtedness." The power of attorney also gave Ford Credit the power to "perform all acts and to do all things necessary or appropriate in discharge of the power ... conferred." We conclude that if any fiduciary duty was created by the power of attorney, the duty would only be between the parties to the agreement, the dealership and Ford Credit. Regardless, we do not need to decide whether this document somehow created a fiduciary duty in light of the jury's finding that Ford Credit's acts of bad faith did not result in any damage to the dealership. Moreover, Lyons argues that the standard provision of the agreements executed by Ford with the various corporations requiring Ford to refrain from "publish[ing] or employ[ing] any misleading, deceptive or unethical practice or advertising" required Ford to conduct itself in good faith. We read this provision to be a written expression of the duty of good faith which is an implied condition in every contract. *See Estate of Chayka,* 47 Wis. 2d 102, 108, 176 N.W.2d 561, 564 (1970). This condition may have served as a basis for Lyons' breach of contract claims but in no way creates the required duty supporting a cause of action for the tort of bad faith.

the exercise of its function of overseeing and implementing the statewide development of the law." *Id.*

To permit a jury award to stand upon a claim not recognized under the laws of this state constitutes a miscarriage of justice which compels us, in the interest of justice, to set aside those portions of the jury verdict which awarded damages for the claimed tort of bad faith. Therefore, we affirm those portions of the judgment which denied this relief and reverse that portion of the judgment which awarded it.[7]

## B. *Conspiracy*

The jury found that Ford and Ford Credit conspired to willfully injure the reputation, trade and business of Lyons, the dealership, United Leasing Services and United Leasing and Financial Services. Damages in various amounts totaling $654,267.38 were awarded to these parties. Ford and Ford Credit argue that under *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984), Lyons and his corporations do not have a cause of action because Ford and Ford Credit, Ford's wholly owned subsidiary, are unable to engage in a conspiracy as a matter of law. We agree.

In *Copperweld,* the United States Supreme Court held that a parent corporation and its wholly owned subsidiary were unable to conspire within the meaning of § 1 of the Sherman Act. *See* 15 U.S.C. § 1 (1982). There, Copperweld and its wholly owned subsidiary, Regal Tube, notified suppliers of Independence Tube, a Regal competitor, that Copperweld would be "great-

---

[7]Our holding on this issue disposes not only of the issues raised upon appeal, but also Ford's cross-appeal on the same issue.

ly concerned if [Independence Tube] contemplates entering the structural tube market ... in competition with Regal Tube" and indicated that Copperweld would take "any and all steps which [would be] necessary to protect [its] rights." *Copperweld,* 467 U.S. at 756–57 (quoting Copperweld letter). After Independence Tube started an antitrust action, a jury found that Copperweld and Regal Tube had conspired to violate § 1 of the Sherman Act. *Id.* at 757–58. However, the Court noted that the Sherman Act is premised on the distinction between concerted and independent action. *Id.* at 767. The Court reasoned:

> [T]he coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise for purposes of § 1 of the Sherman Act. A parent and its wholly owned subsidiary have a complete unity of interest. Their objectives are common, not disparate; their general corporate actions are guided or determined not by two separate corporate consciousnesses, but one. They are not unlike a multiple team of horses drawing a vehicle under the control of a single driver. With or without a formal "agreement," the subsidiary acts for the benefit of the parent, its sole shareholder. If a parent and a wholly owned subsidiary do "agree" to a course of action, there is no sudden joining of economic resources that had previously served different interests, and there is no justification for § 1 scrutiny.
>
> Indeed, the very notion of an "agreement" in Sherman Act terms between a parent and a wholly owned subsidiary lacks meaning. A § 1 agreement may be found when "the conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." *American Tobacco Co. v. United States,* 328

427

U.S. 781, 810, 90 L. Ed. 1575, 66 S. Ct. 1125 (1946). But in reality a parent and a wholly owned subsidiary *always* have a "unity of purpose or a common design." They share a common purpose whether or not the parent keeps a tight rein over the subsidiary; the parent may assert full control at any moment if the subsidiary fails to act in the parent's best interests.

*Id.* at 771–72 (footnote omitted, emphasis in original). In short, the Court recognized "that the ultimate interests of the subsidiary and the parent are identical, so the parent and subsidiary must be viewed as a single economic unit." *Id.* at 772 n. 18. The Court concluded:

The appropriate inquiry in this case, therefore, is not whether the coordinated conduct of a parent and its wholly owned subsidiary may ever have anticompetitive effects .... Nor is it whether the term "conspiracy" will bear a literal construction that includes parent corporations and their wholly owned subsidiaries. For if these were the proper inquiries, a single firm's conduct would be subject to § 1 scrutiny whenever the coordination of two employees was involved. Such a rule would obliterate the Act's distinction between unilateral and concerted conduct .... Rather, the appropriate inquiry requires us to explain the logic underlying [the exemption of] ... unilateral conduct from § 1 scrutiny, and to assess whether that logic similarly excludes the conduct of a parent and its wholly owned subsidiary. ... [W]e can only conclude that the coordinated behavior of a parent and its wholly owned subsidiary falls outside the reach of that provision.

*Id.* at 776 (citation omitted).

Wisconsin's counterpart to the first two sections of the Sherman Act is codified in sec. 133.03, Stats. *See Grams v. Boss,* 97 Wis. 2d 332, 346, 294 N.W.2d 473, 480 (1980) (construing sec. 133.01, Stats. (1977), the predecessor to current sec. 133.03). Because our interpretation of sec. 133.03 is controlled by federal court decisions under the Sherman Act, *see id.,* we conclude, pursuant to *Copperweld,* that in Wisconsin a parent corporation and its wholly owned subsidiary are unable to engage in a conspiracy under sec. 133.03. This does not entirely answer our inquiry, however, since Lyons' claim is under sec. 134.01, Stats., not sec. 133.03. The issue thus becomes whether the underlying goals served by sec. 133.03 are also served, at least in part, by sec. 134.01 and are invoked in this case, thereby permitting application of the *Copperweld* rule.

Section 134.01, Stats., is designed to protect individuals from a conspiracy intended to maliciously or willfully injure another's reputation, trade, business or profession. We recognized in *Gerol v. Arena,* 127 Wis. 2d 1, 10–11, 377 N.W.2d 618, 622 (Ct. App. 1985), that there is not always a connection between the two chapters. This language connotes that there are also areas where a connection does exist. We even opined in *Gerol* that a sec. 134.01 violation could occur which would result in reduced competition, the very evil addressed by ch. 133, Stats. *Id.* at 11, 377 N.W.2d at 622. We noted that a ch. 133 action has an economic basis and recognized that a sec. 134.01 action might or might not have such a premise. *Id.* at 10, 377 N.W.2d at 622.

In this case, the conspiracy claims made by Lyons do have an economic basis because they allege that Ford and Ford Credit conspired to "tortiously inter-

429

fere in the contracts and business of the defendants."
The basis of this complaint is clearly economic and
rests upon the policy of this state which seeks to
assure free and open competition in the marketplace,
unimpeded by the conspiracy of others.

Since the principles invoked by Lyons are emb-
raced by the policies of both secs. 133.03 and 134.01,
Stats., we conclude the *Copperweld* rule applies,
rendering Ford and its wholly owned subsidiary, Ford
Credit, incapable as a matter of law of conspiring as
alleged in the complaint.[8]

---

[8]Our conclusion finds support in *In re Ray Dobbins Lincoln-
Mercury, Inc.,* 604 F. Supp. 203, 204–05 (W.D. Va. 1984), where the
court was interpreting a Virginia statute very similar to sec.
134.01, Stats. Virginia code section 18.2–499(a) provides that:

> [a]ny two or more persons who shall combine, associate,
> agree, mutually undertake or concert together for the purpose of
> willfully and maliciously injuring another in his reputation,
> trade, business or profession by any means whatever, or for the
> purpose of willfully and maliciously compelling another to do or
> perform any act against his will, or preventing or hindering
> another from doing or performing any lawful act, shall be jointly
> and severally guilty of a Class 3 misdemeanor. Such punishment
> shall be in addition to any civil relief recoverable under
> § 18.2–500.

Va. Code Ann. § 18.2–499(a) (1982).

However, Lyons points out that, in other settings, a parent
corporation and its wholly owned subsidiary have been found to be
able to have conspired. *See Haroco v. American Nat'l Bank and
Trust Co.,* 747 F.2d 384, 403 n. 22 (7th Cir. 1984), *aff'd,* 476 U.S. 606
(1985) (under RICO provisions in 18 U.S.C. § 1962(c) (1982), a
parent corporation and its wholly owned subsidiary are capable of
conspiring). We find *Haroco* unpersuasive because we are not
faced with a specific definition of clear legislative goals which
underlie the RICO provisions. In addition, Lyons contends that
*Copperweld* should not be given retroactive application. We

To permit a jury award to stand based upon alleged conspiratorial conduct which the law does not recognize as actionable constitutes a miscarriage of justice which compels us, in the interest of justice, to overturn this portion of the jury verdict. Therefore, we affirm this portion of the judgment.

## C. *Section 218.01, Stats.—Standing*

### 1. Unconscionable Practices

Lyons alleged that Ford and Ford Credit engaged in unconscionable acts contrary to sec. 218.01(3)(a)11, Stats., which are actionable under sec. 218.01(9).[9] The jury agreed and awarded damages against Ford in various amounts totaling $1,957,845.38 to Lyons, the dealership, United Leasing and Financial Services, United General Leasing, United Leasing Services and the Budget Rent-A-Car operations in Milwaukee, Green Bay and Wausau. The trial court overturned these awards on motions after verdict. The jury did not award any damages against Ford Credit for its unconscionable practices.

Ford and Ford Credit argue that Lyons and the other claimants (with the exception of the dealership)

remind Lyons that *Copperweld* deals with the United States Supreme Court's interpretation of a federal statute and serves as only persuasive authority for our interpretation of sec. 134.01, Stats.

[9]Regarding sec. 218.01(3)(a), Stats., Lyons alleged that Ford and Ford Credit violated subsec. 11 by engaging in unconscionable practices, subsec. 16 by inducing certain of the appellants to enter into agreements and engaging in other unfair acts and threatening to cancel their franchises, subsec. 23 by unreasonably withholding approval of a change of ownership and subsec. 15 by coercing acceptance of unordered vehicles.

do not have an unconscionable practice claim under sec. 218.01, Stats., because the claimants either are not properly licensed under this chapter or are asserting claims which are unrelated to their sec. 218.01 licenses. This requires us to address the status of each claimant under sec. 218.01.

It is undisputed that the dealership held a motor vehicle dealer license under this section and, as a result, Ford and Ford Credit's challenge does not reach the jury award to the dealership. It also is undisputed that the Milwaukee, Green Bay and Wausau budget operations did not hold licenses because daily rent-a-car operations cannot be licensed under sec. 218.01, Stats. Only organizations which rent motor vehicles with an option to purchase fall under the "motor vehicle dealer" definition. *See* sec. 218.01(1)(n). It is also undisputed that United Leasing Services did not hold a license, although Lyons alleged that United Leasing Services utilized motor vehicle leases both with and without options to purchase thereby qualifying it as a motor vehicle dealer. *See* sec. 218.01(1)(n)1.

As to the remaining entities, Lyons testified that he has had a Wisconsin motor vehicle salesman's license since 1962. The record also indicates that United Leasing and Financial Services had a used motor vehicle dealer's license for the years 1978 through 1981 and that United General Leasing[10] had applied for a used motor vehicle dealer's license for the years 1978 through 1980.

Section 218.01(1), Stats., in defining a "motor vehicle dealer," provides:

---

[10]This entity was also known at times relevant to this litigation as General Leasing.

(n) "Motor vehicle dealer" means any person, firm or corporation, not excluded by par. (o) who:

1. For commission, money or other thing of value, sells, exchanges, buys, rents with the option of purchase, offers or attempts to negotiate a sale or exchange of an interest in motor vehicles; or,

2. Is engaged wholly or in part in the business of selling motor vehicles ....

(o) The term "motor vehicle dealer" does not include:

1. Receivers, trustees, administrators, executors, guardians or other persons appointed by or acting under the judgment or order of any court; or

2. Public officers while performing their official duties; or

3. Employees of persons, corporations or associations enumerated in subds. 1 and 2, when engaged in the specific performance of their duties as such employees. [or]

4. Sales finance companies or other loan agencies who sell or offer for sale motor vehicles repossessed or foreclosed by them under terms of an instalment contract, or motor vehicles taken in trade on such repossessions.

Section 218.01 does not expressly define the term "licensee."

This issue before us is one of statutory construction which presents a question of law. *See Denter,* 121 Wis. 2d at 122, 357 N.W.2d at 557.

Section 218.01, Stats., is a remedial statute with a purpose to furnish a motor vehicle dealer with some protection against unfair treatment by a manufacturer. *See Forest Home Dodge, Inc. v. Karns,* 29 Wis. 2d 78, 85, 138 N.W.2d 214, 218 (1965). It was enacted in

recognition of the long history of abuse of dealers by manufacturers. *Id.* at 85, 138 N.W.2d at 217–18. Section 218.01 regulates the distribution, sale and financing of new and used motor vehicles. It provides that all motor vehicle manufacturers, factory representatives, distributor representatives, dealers, salesmen and sales finance companies must obtain a license in order to do business. Section 218.01(2). Any licensee which suffers a pecuniary loss may maintain an action for civil damages when any other licensee violates specific subsections of sec. 218.01(3)(a). Section 218.01(9).

Lyons argues that in light of the sec. 218.01, Stats., remedial function, we should construe the terms "motor vehicle dealer" and "licensee" as interchangeable. Lyons argues that all of the claimants fall under the definition of a motor vehicle dealer and, therefore, we should read the licensing requirement liberally and hold that all the purported motor vehicle dealers, licensed or not, may maintain an action under this statute.[11]

---

[11]In support of this argument, Lyons cites *Stepp v. Ford Motor Credit Co.,* 623 F. Supp. 583 (E.D. Wis. 1985). In *Stepp,* the district court reexamined an earlier order holding that Stepp had standing to pursue its claim against Ford Credit even though it was not licensed under sec. 218.01, Stats. *Id.* at 590. Examination of the earlier order reveals that the basis for the district court's holding was its conclusion that Stepp was the only person available to assert the sec. 218.01 claims against Ford Credit. *See Stepp v. Ford Motor Co.,* No. 80-C-776, slip op. at 14 (E.D. Wis. June 18, 1981).

If we were to seek to distinguish *Stepp,* we would note that this case does present a qualified licensee—the dealership—as an entity with proper standing to assert the sec. 218.01, Stats., unconscionable practices claim.

More fundamentally, however, we respectfully disagree with the district court's reasoning, and we are not bound by its holding. *See*

434

We reject Lyons' argument and hold that before a motor vehicle dealer may maintain an action for civil damages under sec. 218.01(9), Stats., the dealer must be licensed within the meaning of sec. 218.01. The licensing provisions of sec. 218.01 ensure the honesty, integrity, competency and financial stability of licensees. *See Department of Transp. v. Transportation Comm'n,* 111 Wis. 2d 80, 95, 330 N.W.2d 159, 166 (1983). The licensing requirements also carry a consumer protection feature in that they seek to ensure that motor vehicle purchasers will not be subjected to fraud. *See State v. Helwig,* 262 Wis. 299, 301, 54 N.W.2d 907, 908 (1952). Moreover, the licensing provisions carry jurisdictional ramifications for all licensees including out-of-state manufacturers. *See Nagle Motors, Inc. v. Volkswagen N. Cent. Distrib., Inc.,* 51 Wis. 2d 413, 420-21, 187 N.W.2d 374, 380 (1971). Consequently, we construe the licensing requirement under sec. 218.01 to be crucial to the recognized goals of this chapter. Therefore, standing as a licensee is essential to the assertion of any claim under this chapter.

■

The Wisconsin Supreme Court has recognized that a failure to hold a license will not defeat a contractual cause of action where the activity is an "isolated transaction" and where the entity asserting the claim is licensed by another jurisdiction under a regulatory scheme similar to that in Wisconsin. *Schroeder v. Ajax Corp.,* 71 Wis. 2d 828, 239 N.W.2d

*Gerol v. Arena,* 127 Wis. 2d 1, 9, 377 N.W.2d 618, 622 (Ct. App. 1985).

342 (1976). Under this rule, the licensing statute must be designed to regulate those who engage in or conduct business in Wisconsin on a regular basis. *Id.* Here, the unlicensed claimants do not assert contractual claims. Rather, they invoke the remedies and protections of the very licensing statute with which they have failed to comply. Moreover, their activities abound in Wisconsin and cannot be considered isolated transactions in any sense.

■ This construction clearly deprives the Budget Rent-A-Car operations of standing to assert a sec. 218.01, Stats., claim because, as we have already noted, these entities are ineligible to hold a license under sec. 218.01 and do not fall under the definition of a motor vehicle dealer pursuant to sec. 218.01(1)(n).

This construction also deprives United Leasing Services of standing since it also was not licensed under sec. 218.01, Stats. Lyons argues, however, that United Leasing Services would have been licensed but for Ford's failure to notify the department of transportation of the supplemental leasing agreements it had with United Leasing Services. *See* sec. 218.01(2)(bd).

Section 218.01(2)(bd), Stats., allows a motor vehicle manufacturer to file with the department of transportation the basic agreement that it uses for all its dealers in Wisconsin. If this basic agreement is on file, a dealer is not required to additionally file the written agreement. *Id.* This statute also requires that the manufacturer notify the department of any supplements or revisions to the basic agreement or the appointment of any additional dealers. *Id.* Lyons argues that had Ford notified the department of the vehicle leasing agreement used with corporations like United Leasing Services, the department would have

required those corporations to acquire a motor vehicle dealer's license under this statute. We disagree.

Section 218.01(2)(a), Stats., places the burden on the entity acting as a motor vehicle dealer to acquire a license in order to legally engage in business in Wisconsin. The manufacturer's basic agreement provision of sec. 218.01(2)(bd) in no way shifts the licensing burden. It merely relieves the license applicant from the obligation to submit a certified copy of the written agreement under sec. 218.01(2)(bc). Therefore, the failure of Ford to file supplements or revisions to the basic agreement did not relieve United Leasing Services of its obligation to acquire a motor vehicle dealer's license. Failure to do so rendered United Leasing Services without standing to assert a sec. 218.01 claim.

Next, Lyons attempts to salvage the jury awards to himself, United Leasing and Financial Services and United General Leasing by pointing to their respective sec. 218.01, Stats., licenses. However, Ford and Ford Credit argue that the claims made by a licensee under sec. 218.01 must be related to the scope of the license. We agree.

A license is a right or permission granted by competent authority to do an act which would be illegal without the license. *State v. Jackman,* 60 Wis. 2d 700, 711, 211 N.W.2d 480, 487 (1973). The scope of the right given by the license must, however, be restricted to the four corners of the license. It follows therefore that an entity licensed for one function under sec. 218.01, Stats., may not claim rights or authority beyond such license.

Here, Lyons is apparently licensed as a motor vehicle salesman. His claims, however, relate to Ford and Ford Credit's conduct against the dealership and the other companies. None of the allegations relates to Lyons' role as a motor vehicle salesman. Consequently, Lyons' claims are outside the scope of his salesman's license. Therefore, Lyons is without standing to assert a sec. 218.01, Stats., claim.

Likewise, the claims against Ford and Ford Credit for unconscionable conduct are outside the scope of any used motor vehicle dealer's licenses held by United Leasing and Financial Services and United General Leasing. Although not expressly stated, sec. 218.01, Stats., distinguishes between new and used motor vehicle dealers. A new motor vehicle dealer may only sell new motor vehicles for which the dealer is franchised. Section 218.01(3)(a)27. A used motor vehicle dealer, however, is not franchised by a manufacturer and may sell any type of motor vehicle meeting the "used" definition.[12] Any entity leasing

---

[12]Wisconsin Adm. Code, sec. Trans 137.03(7) defines a new motor vehicle to be "any motor vehicle other than a used motor vehicle as defined in sub. (9)." Wisconsin Adm. Code, sec. Trans. 137.03(9) defines a used motor vehicle to be:

(a) Any motor vehicle which has been privately titled, or

(b) Any motor vehicle which has not been privately titled, but:

1. Has been operated more than 6,000 miles, or

2. Has been operated more than 4,000 cumulative miles, and owned more than 120 days by the licensee currently offering the vehicle for sale, or

3. Has sustained damage while in-transit and has been acquired by the motor carrier from the motor vehicle manufacturer because of the liability agreement between the manufacturer and carrier, or

new cars with the option to purchase would have to be licensed as a new motor vehicle dealer operation under this statute.

The claims raised by United Leasing and Financial Services and United General Leasing against Ford and Ford Credit relate only to alleged acts which caused damage to the leasing businesses and not to any used car sales. Since United General Leasing and United Leasing and Financial Services are licensed only as used motor vehicle dealers, they are without standing to assert a sec. 218.01, Stats., claim relating to their leasing functions.

To permit jury awards to stand in favor of parties who have no standing to assert claims under the law is a miscarriage of justice which compels us, in the interest of justice, to set aside those portions of the verdict premised upon claimed unconscionable practices under sec. 218.01, Stats. Therefore, we affirm this portion of the judgment. As noted, this "standing" holding does not extend to the finding of unconscionable practices against Ford and the resultant award ($443,117.38) to the dealership.

### 2. Unordered Vehicles

In addition to the unconscionable practices claims, the dealership also alleged violations of sec. 218.01(3)(a)15, Stats., against Ford and Ford Credit. The dealership claimed that Ford coerced it to accept delivery of unordered vehicles and that Ford Credit participated in the coercion by paying for the unord-

---

4. Is of a previous model year. A vehicle shall be considered to be a previous model year after December 31 of the calendar year identical to the manufacturer's designated model year.

ered vehicles. The jury found in favor of the dealership on these claims and awarded damages against Ford in the amount of $28,192.45 and against Ford Credit in the amount of $11,846.91. The trial court permitted these awards to stand in the judgment.

As an extension of the standing issue, we also conclude on cross-appeal that Ford Credit cannot be held liable for a claimed violation of sec. 218.01(3)(a)15, Stats. We are not required to perform an "interest of justice" analysis in order to reach this issue because this ruling by the trial court confirmed the verdict, rather than vacated it.[13]

The record indicates that Ford Credit only held a sales finance company license under this section. A sales finance company is defined by sec. 218.01(1)(v), Stats., as:

> any person, firm or corporation engaging in the business, in whole or in part, of acquiring by purchase or by loan on the security thereof, or otherwise, retail instalment contracts from retail sellers in this state, including any motor vehicle dealer who sells any motor vehicle on an instalment contract or acquires any retail instalment contracts in his retail sales of motor vehicles.

The statute requires not only that one suffering a pecuniary loss be a licensee but that the violation be committed by a licensee. *See* sec. 218.01(9)(a), Stats. Consistent with our holding above that a claimant licensee must assert claims within the scope of and related to his licensed activity, so also do we conclude that a defendant licensee should and must be sued in a capacity within the scope of and related to such licensed activity.

---

[13] *See, infra,* Section V.

Lyons claims that Ford Credit coerced the dealership's acceptance of the unordered vehicles by paying Ford for the vehicles in the name of the dealership under a power of attorney given to Ford Credit by the dealership. Lyons' claims, however, were in no way related to Ford Credit's acquisition of retail installment contracts and were thereby unrelated to Ford Credit's sales finance company license. Indeed, it appears from our reading of the statute that Ford Credit's role as the dealership's financier vis-a-vis Ford is not an activity requiring a license under sec. 218.01, Stats. Consequently, any liability of Ford Credit to Lyons for this alleged activity is not actionable under sec. 218.01.

Therefore, we affirm this portion of the judgment. Again, this "standing" holding does not extend to the finding against Ford that it coerced the acceptance of vehicles in violation of sec. 218.01(3)(a)15, Stats.

## IV. MOTIONS AFTER VERDICT RULINGS NOT REVIEWED IN THE INTEREST OF JUSTICE

In addition to the issues discussed above which we have reviewed in the interest of justice, there were additional rulings by the trial court on motions after verdict which overturned other portions of the jury verdict. We have examined these issues and conclude that they do not merit our review in the interest of justice. Nonetheless, we choose to discuss certain of them on a limited basis in this section of the opinion. As to all these issues (whether discussed hereinafter or not), we affirm the jury's findings and direct, upon remand, that judgment consistent therewith be entered accordingly.

## A. *Ford Credit's Breach of Contract*

The jury found that Ford Credit breached the FPFA by failing to limit the dealership's credit line and by paying for unordered vehicles and vehicles it was not required to pay for under the agreement. Damages in favor of the dealership and against Ford Credit were awarded in the amount of $101,846.91. The trial court eliminated this award in its belated rulings on the motions after verdict.

In defending the trial court's ruling, Ford Credit argues that all of its actions were expressly authorized under its contract and therefore it did not breach the agreement as a matter of law. We disagree.

██

Appellate review of a jury's findings is limited to whether the record contains any credible evidence that under any reasonable view supports the verdict and removes the issue from the realm of conjecture. *Fantin v. Mahnke,* 113 Wis. 2d 92, 97, 334 N.W.2d 564, 567 (Ct. App. 1983).

Although Ford Credit finds support for its position in certain express language of the FPFA, the duty of good faith is an implied condition in every contract, *see Estate of Chayka,* 47 Wis. 2d 102, 108, 176 N.W.2d 561, 564 (1970), and the jury was so instructed in this case. Under one reasonable view of the evidence, considered in light of good faith requirements, Ford Credit violated the terms of the agreement by paying for unordered vehicles or extending credit in bad faith. The record indicates that Ford Credit raised the dealership's credit line and paid for unordered vehicles after being notified that Ford was shipping the dealership unordered vehicles at a time when the

dealership's financial position was very tenuous. Therefore, credible evidence exists to support the jury's finding of a breach of the implied good faith terms of the FPFA by Ford Credit.

In light of the sufficiency of the evidence on this question, we are not persuaded, in the interest of justice, to seek to do what the trial court lost competence to do by virtue of its failure to act within the prescribed statutory time limits on the motions after verdict. Accordingly, we affirm the jury's finding that Ford Credit breached the FPFA and we reverse this portion of the judgment. Upon remand, we direct that judgment be entered in favor of the dealership and against Ford Credit in accordance with the verdict as to this cause of action.

### B. *Awards to Green Bay Rental Cars and Wausau Car Rentals*

The jury awarded Green Bay Rental Cars and Wausau Car Rentals damages for Ford's breach of the LMDDR assignments. The trial court vacated these awards by its belated rulings on motions after verdict. We conclude that the jury's determinations as to these breaches of contract and the resultant damages ($62,150.35 to Wausau and $74,484.49 to Green Bay) are supported by credible evidence. For the same reasons as noted above, we are not compelled in the interest of justice to seek to do what the trial court lost competence to do by virtue of its belated rulings on motions after verdict. Therefore, we confirm these portions of the jury verdict and direct upon remand that judgment be entered in favor of these claimants

in accordance with the verdict as to these causes of action.

## C. *Award to the Dealership For Ford's Unconscionable Practices*

The jury found that Ford had committed unconscionable practices pursuant to sec. 218.01(3)(a)11, Stats., against the dealership and awarded $443,117.38 in damages. The trial court vacated these awards by its belated rulings on motions after verdict. Essentially the trial court's rulings were premised upon sufficiency of evidence considerations both as to the unconscionable actions and the damages.

We will not repeat here the volumes of testimony going to the prosecution and defense of these claims at trial. We deem it sufficient to state here that this entire question, in our judgment, falls within the realm of the trier of fact and that the question was properly submitted to the jury.

The resolution of the dealership's unconscionable practices claims against Ford rests principally upon the trier of fact's assessment of the competing claims and versions offered by the respective parties. In this regard, Lyons' testimony stands as the critical evidence. If believed, this evidence demonstrates a policy of deceit, double-dealing, broken promises, misrepresentation and coercion by Ford with the design, or at least the result, of forcing the dealership into financial ruin. If rejected, this testimony represents the fictional "tale of darkness" by which, as Ford contends, Lyons seeks to have the earth "rotate around the moon." The jury resolved this factual and credibility dispute in favor of the dealership.

■ Our function here is not to pass upon the correctness of the trial court's substitution of judgment for that of the jury. Rather, we must determine whether we are compelled, in the interest of justice, to seek to accomplish what the trial court lost competency to do in its rulings on motions after verdict, to wit, set aside the jury's verdict. We are not so compelled. We see no miscarriage of justice in leaving this credibility issue in the posture in which the jury has resolved it. Therefore, we confirm the jury's findings as to Ford's unconscionable practices. On remand, we direct that judgment be entered in favor of the dealership and against Ford in accordance with the jury verdict on this cause of action.

## V. ISSUES REVIEWED DIRECTLY ON APPEAL AND CROSS-APPEAL

In addition to those rulings on motions after verdict which overturned portions of the verdict, additional rulings on motions after verdict were denied, thereby confirming certain portions of the verdict. These rulings are similarly void under *Jansen.* However, because these motions, in any event, are deemed denied pursuant to sec. 805.16, Stats. (1981–82), they are directly appealable by the aggrieved party. Therefore, we are not required to perform an "interest of justice" analysis as to the following issues:

### A. *Section 218.01(3)(a)15, Stats., Unordered Vehicles Award*

In addition to the unconscionable practices claims, the dealership also alleged a violation of sec.

218.01(3)(a)15, Stats., against Ford. The dealership claimed that Ford coerced it to accept delivery of unordered vehicles. The jury found in favor of the dealership on this claim and awarded damages against Ford in the amount of $28,192.45. The trial court permitted this award to stand in the judgment. Ford challenges this award on cross-appeal.

Specifically, Ford contends that the evidence is insufficient to establish inducement or coercion under the statute. Again we recall our standard of review which requires us to determine whether the record contains any credible evidence that under any reasonable view supports the verdict and removes the issue from the realm of conjecture. *Fantin,* 113 Wis. 2d at 97, 334 N.W.2d at 567.

Ford argues that the delivery of certain of these vehicles was in keeping with company policy and met with little or no objection from the dealership. Even accepting these arguments, this does not mean that the practice could not be in violation of the statute. Nonetheless, the dealership's evidence indicated that the volume was nearly double that of ordered vehicles and that the flow continued despite efforts to stem it. Therefore, credible evidence was presented to support the jury's finding.

Ford also challenges the damage award for this violation as unduly speculative. If there is any credible evidence which under any reasonable view supports the jury finding as to the amount of damages, especially where the verdict has the approval of the trial court, this court will not disturb the finding unless the award shocks the judicial conscience. *See Brain v. Mann,* 129 Wis. 2d 447, 455, 385 N.W.2d 227,

231 (Ct. App. 1986). The dealership's principal loss as a result of Ford's activity lay in its increased interest obligations under the floor plan agreement. Testimony and documentary evidence established this loss. Ford complains that this evidence did not take into consideration the amount realized from the sale of these vehicles. Gratuitously assuming that this is a consideration which could have mitigated damages, we note that the dealership's failure to factor it into its damage calculations was, in any event, made known to the jury. We do not see the damage award for this violation as falling into the realm of prohibited speculation, nor are we shocked by the amount.

### B. *Section 218.01, Stats.—Treble Damages*

As we have already concluded, our interpretation of sec. 218.01, Stats., does not affect the jury's award to the dealership for Ford's unconscionable conduct and for its coercion of the dealership to accept unordered vehicles. Also, as we have already concluded, we do not overturn the jury's award on these claims in the interest of justice.

Based upon these awards, the dealership requested the trial court to treble the damages and to award costs, including attorney's fees, under the language of sec. 218.01(9)(a), Stats. Ford, however, argued that it was within the trial court's discretion whether to award this added relief. The trial court agreed with Ford and declined the dealership's request.

Section 218.01(9)(a), Stats., provides in relevant part:

> Any licensee suffering pecuniary loss because of a violation by any other licensee of sub. ... 11, 15, 16 ... [or] 23 ... or because of any unfair

practice ... *may* recover damages ... in any court
of competent jurisdiction in an amount equal to 3
times the pecuniary loss together with costs includ-
ing a reasonable attorney fee. [Emphasis added.]

Following the previously stated rules of statutory
construction, we independently review sec.
218.01(9)(a), Stats., and conclude that its language is
ambiguous regarding the award of treble damages and
costs. In other words, under one construction of the
statute a reasonably well-informed person could con-
clude that the use of the word "may" gives the trial
court the discretion to award treble damages and
costs. Under a different construction of the same
statute, however, a reasonably well-informed person
could also conclude that the use of the word "may"
vests in the claimant the discretion of whether to seek
the recovery of damages under this statute. *See
Kollasch,* 104 Wis. 2d at 561, 313 N.W.2d at 51–52. We
therefore turn to the subject matter, scope, history
and object to be accomplished to assist in our interpre-
tation of the statute. *See Warren,* 123 Wis. 2d at 488,
368 N.W.2d at 690.

Section 218.01, Stats., implicitly recognizes the
gross disparity of bargaining power between the
manufacturer of automobiles and the local retailer.
*Forest Home Dodge,* 29 Wis. 2d at 85, 138 N.W.2d at
217. This statute functions to promote fair dealing.
*Kuhl Motor Co. v. Ford Motor Co.,* 270 Wis. 488, 502,
71 N.W.2d 420, 427 (1955). We conclude that interpret-
ing sec. 218.01(9) to provide for the mandatory award
of treble damages and costs best supports the legisla-
ture's intention to balance the economic power of
motor vehicle manufacturers and retailers and to
promote fair dealing.

The adoption of Ford's reasoning, moreover, would carry troubling consequences for another section of the very same statute. Section 218.01(9)(b), Stats., in affording relief to retail buyers also uses the word "may":

> Any retail buyer suffering pecuniary loss because of a violation by a licensee of sub. (3) (a)4, 5, 6, 8, 9, 10, 11, 18 or 31 *may* recover damages for the loss in any court of competent jurisdiction together with costs, including reasonable attorney fees. [Emphasis added.]

This section also gives the retail buyer the discretion to seek damages. However, Ford's reasoning would require us to conclude that the trial court could, under this subsection, deny a retail buyer recovery for his pecuniary loss even though the buyer has shown the required violation of sec. 218.01(3)(a). We conclude such a result to be unreasonable and absurd. We must construe statutes so as to reach a commonsense meaning and avoid unreasonable and absurd results. *State v. Barnes,* 127 Wis. 2d 34, 39, 377 N.W.2d 624, 626 (Ct. App. 1985).

When construing a statute, we will consider the related sections. *State v. Clausen,* 105 Wis. 2d 231, 244, 313 N.W.2d 819, 825 (1982). Statutory sections which relate to the same subject matter must be construed *in pari materia. Id.* With this rule in mind, we cannot conclude that the use of the term "may" in successive subsections of the same statute dealing with the same subject somehow vests the court with a greater power in the former and less in the latter. Therefore, we reverse the ruling of the trial court and direct upon remand that the dealership's jury award for Ford's

sec. 218.01, Stats., violations be trebled; that, after appropriate hearing, the dealership be awarded its costs, including reasonable attorney fees related to the sec. 218.01 violations; and that judgment be entered accordingly.

## C. *Deficiency Recovery*

Included in the jury award to Ford Credit was an allowance for a deficiency judgment ($177,470.32) related to Ford Credit's repossession of secured vehicles and their subsequent sale.[14] On appeal, the dealership argues that Ford Credit is absolutely barred from any deficiency recovery under the FPFA[15] in light of the jury's finding that Ford Credit

[14]Also, we note that Lyons and United Leasing and Financial Services appeal the jury determination holding them liable under a personal guarantee for the dealership's obligations to Ford Credit under the FPFA. This issue is premised upon the trial court's refusal to instruct the jury as to the material alteration of a contract underlying a guarantee. *See Lakeshore Commercial Fin. Corp. v. Drobac,* 107 Wis. 2d 445, 454, 319 N.W.2d 839, 844 (1982). Lyons contends that the contractual terms substantially changed when the dealership was given both a Ford and a Lincoln-Mercury franchise and when Ford Credit continually increased the dealership's credit limit. However, the adjustment of credit was clearly allowed under the FPFA and the dualing of the dealership merely increased the number of Ford products available for sale by the dealership. Moreover, the record indicates that the dualing of the dealership was accomplished at Lyons' repeated insistance, contrary to the rule of material alteration that a change only discharges a guarantor if it injures the guarantor and is made without the consent of the guarantor. *Id.* Regardless, the issue is moot in light of our holding in this section that Ford Credit is precluded from obtaining a deficiency judgment for the floor plan vehicles.

[15]Unlike the LMDDR, the FPFA indicates that it should "be interpreted in accordance with the laws of the state of the Dealer's

had sold the repossessed floor plan vehicles in a commercially unreasonable manner.[16] This question is one of law since it concerns an application of the relevant Wisconsin adopted provisions of the Uniform Commercial Code, secs. 409.501 to 409.507, Stats., to the facts of this case. *Bucyrus-Erie Co. v. DILHR,* 90 Wis. 2d 408, 417, 280 N.W.2d 142, 146–47 (1979).

place of business." Consequently, we interpret this agreement under Wisconsin law.

[16]Both Ford and Ford Credit contend that they sold the repossessed vehicles in a commercially reasonable manner, as a matter of law. In this case, we view this commercially reasonable sale issue as a question of fact because the answer is dependent upon the surrounding facts and circumstances. *See Appleton State Bank v. Van Dyke Ford, Inc.,* 90 Wis. 2d 200, 205, 279 N.W.2d 443, 445 (1979). We will only overturn the jury's finding if it is not supported by the credible evidence. *Meurer v. ITT Gen. Controls,* 90 Wis. 2d 438, 450, 280 N.W.2d 156, 162 (1979).

Here, the jury's finding that Ford and Ford Credit sold the repossessed vehicles in a commercially unreasonable manner is supported by the credible evidence. A secured party must establish that every aspect of the sale of secured property was commercially reasonable. *Vic Hansen & Sons, Inc. v. Crowley,* 57 Wis. 2d 106, 113, 203 N.W.2d 728, 732 (1973). The secured party owes a duty to the debtor to obtain the best price for the security. *Holt v. Ellsworth Farmers Union Co-op,* 118 Wis. 2d 335, 338, 347 N.W.2d 612, 614 (Ct. App. 1984). The credible evidence indicates that a used rent-a-car fleet almost always sold at a profit. The used vehicle area manager for Ford testified that the Budget vehicles repossessed by Ford were offered at auction only after other Ford vehicles were offered for sale. In addition, the record indicates that while the floor plan vehicles were being auctioned off, an announcement was made that none of the vehicles qualified for any dealer incentives. A jury could reasonably infer that Ford and Ford Credit's procedures at the auctions depressed the amount received for the repossessed vehicles. Therefore, the jury's findings are supported by credible evidence.

The dealership bases its absolute bar argument on *Vic Hansen & Sons, Inc. v. Crowley,* 57 Wis. 2d 106, 115–16, 203 N.W.2d 728, 733 (1973). In *Crowley,* the debtors refused to continue payments on a motor vehicle that they had purchased from the creditor. Subsequently, the creditor obtained possession of the vehicle and "sold" it to itself at a private sale through "an inter-office exchange of papers." *Id.* at 109, 203 N.W.2d at 730. After concluding that the creditor had sold the motor vehicle in a commercially unreasonable manner as a matter of law, our supreme court reasoned that the creditor was precluded from obtaining any deficiency because it failed to show "the amount that should reasonably have been obtained through a sale conducted according to law." *Id.* at 115–16, 203 N.W.2d at 733.

We disagree with the dealership's contention that under *Crowley* or any of the subsequent cases cited a creditor is absolutely precluded from recovering a deficiency against a debtor when the creditor has sold the security in a commercially unreasonable manner. *Crowley* only places an evidentiary burden on a creditor engaging in a commercially unreasonable sale to show "the amount that should reasonably have been obtained through a sale conducted according to law." A deficiency recovery is precluded only when a creditor fails to meet this evidentiary burden.

Here, however, Ford Credit does not direct us to that evidence (nor have we discovered it in this mammoth record) which indicates the amount the floor plan vehicles should have sold for in a sale conducted according to the law. A sale price is not evidence of fair market value when collateral is sold in a commercially unreasonable manner. *First Wis.*

*Nat'l Bank v. Wilson,* 121 Wis. 2d 505, 508, 360 N.W.2d 548, 550 (Ct. App. 1984). Although we have examined the plethora of material presented to us on all issues in this case, we note that it is not our obligation to extensively sift the enormous record for facts supporting or discrediting the position of any party on any issue. *See Keplin v. Hardware Mut. Casualty Co.,* 24 Wis. 2d 319, 324, 129 N.W.2d 321, 323 (1964). Such holds true for this issue.

Consequently, Ford Credit has failed to meet its evidentiary burden on this question and is therefore precluded from obtaining a deficiency judgment for the floor plan vehicles. As a result, we overturn this aspect of the jury's verdict and reverse this portion of the judgment.

The jury also found that Ford had sold its repossessed vehicles under the LMDDR in a commercially unreasonable manner. The trial court concluded that this finding served as a bar to Ford's claim for a deficiency judgment. Ford argues on cross-appeal that Michigan law controls this question and that such law permits the recovery of a deficiency judgment against the dealership for the sale of the repossessed vehicles. We agree.

As with the discussion just completed regarding deficiency judgments, the question presented is one of law. Moreover, issues as to the construction of unambiguous contract provisions also present a question of law. *Jones v. Jenkins,* 88 Wis. 2d 712, 722, 277 N.W.2d 815, 819 (1979).

The LMDDR included the unambiguous language that the contract "is a Michigan agreement and shall be interpreted, construed and enforced in accordance with the laws of Michigan." Section 401.105(1), Stats.,

indicates that "when a transaction bears a reasonable relation to this state and also to another state or nation the parties may agree that the law either of this state or of such other state or nation shall govern their rights and duties."

The dealership initially argues that although the choice of law provision is to be given considerable weight, the law of the jurisdiction with the most significant contacts is to be applied. *See Keystone Leasing Corp. v. Peoples Protective Life Ins. Co.,* 514 F. Supp. 841, 847 (E.D. N.Y. 1981). The official comments to U.C.C. § 1–105 indicate that a transaction's significant contacts are factors in the choice of law. *See Wilcox v. Wilcox,* 26 Wis. 2d 617, 630, 133 N.W.2d 408, 415 (1965). Regardless of the elements of the test, we conclude that the LMDDR transaction bears a reasonable relation to or has significant contacts with Michigan because it is the point of manufacture and shipment of the vehicles. As a result, the initial requirements of sec. 401.105, Stats., are met.[17]

The dealership, nonetheless, contends that sec. 401.105(2)(e), Stats., mandates the application of Wisconsin law. Therefore, the dealership argues that the contractual choice of law provisions are not applicable.

Section 401.105(2), Stats., provides in relevant part:

> Where one of the following provisions of chs. 401 to 409 specifies the applicable law, that provision governs and a contrary agreement is effective only to the extent permitted by the law (including the conflict of laws rules) so specified:

---

[17]We note that the FRAC contains a similar provision and withstands the same scrutiny.

. . . .
 (e) Section 409.103 on the perfection provisions of ch. 409.

Section 409.103, Stats., sets down a framework for the perfection of security interests in particular transactions. In addition, the statute recites which law governs for the perfection of security interests in transactions involving a variety of goods. *See* sec. 409.103(1)(b), (2)(b), (3)(b), (4), (5) and (6). Perfection does not, however, affect the rights and obligations between the debtor and a secured creditor. *See In re L.M.S. Assocs., Inc.,* 18 Bankr. 425, 429 (Bankr. S.D. Fla. 1982). Rather, perfection relates to the rights among competing creditors or others with an interest in the collateral. *Id.*

■■

Here, Ford's perfection of a security interest is not the issue. Rather, at issue is Ford's right to recover a deficiency judgment against the dealership. Consequently, we conclude that the contractual choice of law provision is effective and that the deficiency issue must be resolved under the laws of Michigan.

Turning to Michigan law, the dealership argues that it is unclear whether Michigan allows a creditor to obtain a deficiency judgment when a jury finds that the creditor has disposed of the collateral in a commercially unreasonable manner.[18] The Michigan Court of Appeals has stated in a number of published opinions that a finding that a creditor has sold

---

[18]The dealership finds support for its argument that the law of Michigan is unclear on this question in the Annotation, *Failure of Secured Party to Make "Commercially Reasonable" Disposition of Collateral under UCC § 9–504(3) as Bar to Deficiency Judgment,* 10 A.L.R. 4th 413, 432–33 (1981).

collateral in a commercially unreasonable manner is not an absolute bar to the creditor's recovery of a deficiency judgment. In *Wilson Leasing Co. v. Seaway Pharmacal Corp.,* 220 N.W.2d 83, 89 (Mich. Ct. App. 1974), the court stated:

> Even if a creditor disposes of collateral in violation of the UCC, the debtor is not entitled to completely avoid its obligation to the creditor. Rather, the debtor is entitled to recover "any loss" occasioned by the secured party's failure to comply with the appropriate provisions of the UCC. UCC 9–507(1). [Footnote omitted.]

Moreover, in *Jones v. Morgan,* 228 N.W.2d 419, 423 (Mich. Ct. App. 1975), the court indicated that damages awarded to a debtor for a creditor's commercially unreasonable conduct may be set off against the amounts owed by the debtor to the creditor. *See also Citizens Nat'l Bank v. Mayes,* 350 N.W.2d 809, 811 (Mich. Ct. App. 1984). Although the court's statement of the Michigan rule was not always necessary to the court's disposition of the case before it, we consider the statement to be an affirmative indication of the rule of law in the state of Michigan.[19]

---

[19]Our interpretation of Michigan law has support in other jurisdictions. *See Barbour v. United States,* 562 F.2d 19, 21–22 (10th Cir. 1977).

The dealership, however, supplements its argument with *Honor State Bank v. Timber Wolf Construction Co.,* 391 N.W.2d 442 (Mich. Ct. App. 1986), wherein the court held that a secured creditor's failure to comply with the notice provisions of U.C.C. § 9–504 operated as an absolute bar to the recovery of a deficiency judgment. While the dealership makes a strong argument analogizing the court's holding in *Honor* to our case where the secured creditor failed to follow the commercially reasonable sale require-

Consequently, we conclude that the jury's finding that Ford engaged in commercially unreasonable conduct when selling the LMDDR vehicles does not serve as a bar to Ford's recovery of a deficiency judgment under Michigan law. Rather, any damages suffered by the dealership as a result of Ford's conduct may be set off against the amounts owed by the dealership to Ford. We remand for a hearing to determine the amount of any deficiency owed to Ford under the LMDDR and Michigan law and for the entry of judgment accordingly.[20]

ments of § 9–504, we find *Honor* unpersuasive in light of the express language of the court in *Wilson Leasing Co. v. Seaway Pharmacal Corp.*, 220 N.W.2d 83, 89 (Mich. Ct. App. 1974); *Jones v. Morgan,* 228 N.W.2d 419, 423 (Mich. Ct. App. 1975); and *Citizens Nat'l Bank v. Mayes*, 350 N.W.2d 809, 811 (Mich. Ct. App. 1984), and the failure of *Honor* to discuss these cases.

[20]Normally, we would remand for a determination of not only the deficiency but also any set-off for the dealership's losses resulting from the commercially unreasonable sale. Here, however, the trial court instructed the jury to deduct the dealership's losses, if any, from the amount of the jury's award to Ford for the dealership's termination of the FRAC and the SSA. Generally, we assume that a jury follows the instructions given by the trial court. *See Danow v. United States Fidelity & Guar. Co.*, 37 Wis. 2d 214, 224, 154 N.W.2d 881, 886 (1967). Consequently, we conclude that the dealership has already had its losses set off. Therefore, we remand only for a determination of the deficiency owed to Ford under the LMDDR. In this regard, the dealership objects to the trial court's offset instructions on the ground that it somehow "shifted the burden of proof to the defendants and/or confused the requirements of Section 409.504, Stats., with a cause of action under sec. 409.507(1)." We note, however, that under Michigan law the debtor carries the burden of showing the losses incurred as a result of a commercially unreasonable sale. *See Wilson Leasing,*

In this context, we also address Ford's complaint on cross-appeal that the judgment awarded Ford only statutory attorney fees and costs instead of reasonable attorney fees and costs for repossession and sale as provided for under the LMDDR. This was error under the express terms of the contract. Therefore, we also direct on remand that the trial court determine Ford's reasonable attorney fees and costs related to the repossession and sale of the vehicles in question and for the entry of judgment accordingly. We note, however, that this claim is limited to the fees and costs relating to the replevin and resale. The fee and cost provisions of these agreements do not purport to cover the totality of Ford's costs and fees relating to other causes of action and defenses in this litigation.[21] The trial court should also bear in mind at the hearing upon remand the agreement entered into by the parties voluntarily transferring some of the vehicles from the dealership to Ford.

## D. *First Substantial Breach*

Lyons argues on appeal and in documents supplementing the motions after verdict that Ford should be barred from recovering on its contractual claims under the first substantial breach doctrine.

220 N.W.2d at 89. Consequently, we reject this challenge to the court's instruction.

[21]We also note that Ford Credit had a similar right under the FPFA. However, we consider this amount to be part of any deficiency owed by the dealership to Ford Credit. Based on our earlier conclusions, Ford Credit is not entitled to recover this amount.

We conclude that Lyons has not timely raised this issue so as to mandate our review. Whether a breach of contract exists involves a question of fact which is left to the jurisdiction of the fact finder. *See Koenings v. Joseph Schlitz Brewing Co.,* 126 Wis. 2d 349, 358, 377 N.W.2d 593, 598 (1985). Lyons has made no attempt to show that he proceeded on this theory at trial or requested that the trial court submit specific fact questions or instructions on this issue to the jury.

### E. *Damages to Ford Under the LMDDR*

Special verdict question no. 57 asked:

> What sum of money was due and owing from Kenosha Lincoln-Mercury-Ford, Inc. to the Ford Motor Company on the Dealer Daily Rental Contract at the time of the termination of that contract by the Ford Motor Company on May 2nd, 1980?[22]

The jury found that the dealership owed Ford $474,061.93.

The dealership argues that this portion of Ford's award should be set aside because it contradicts the terms of the LMDDR. The dealership argues that Ford's remedy lies under the following provision of the agreement:

---

[22]The dealership also raises an objection to the form of special verdict question no. 57. Our attention is not directed, however, to an objection to the form of this question at the instruction and verdict conference. Nor are we able to discover an objection. Consequently, we conclude this objection is waived. *See* sec. 805.13(3), Stats.

X. *Disposition of Leased Vehicle.* Upon the expiration or termination of this lease with respect to any Leased Vehicle, Lessee shall promptly purchase and pay for the same at a price, payable upon receipt of invoice submitted by Company to Lessee, equal to the capitalized cost thereof (as above defined) less 2.0833 percent thereof for each month for which the monthly vehicle lease charge has been paid. If Lessee shall fail to do so, Company may take possession of the vehicle, wherever found, and sell the same at public or private sale without notice to Lessee. If the proceeds of such sale are less than the price Lessee should have paid for the vehicle, plus all expenses of taking possession and of sale (including reconditioning, storage, transportation, advertising, and sale commission), Lessee shall pay the difference to Company upon demand.

The construction of a written contract is a question of law which we independently review. *Demerath v. Nestle Co.,* 121 Wis. 2d 194, 197, 358 N.W.2d 541, 543 (Ct. App. 1984). Where the terms of a contract are plain and unambiguous, we will construe it as it stands. *Hortman v. Otis Erecting Co.,* 108 Wis. 2d 456, 461, 322 N.W.2d 482, 484–85 (Ct. App. 1982). It is not our role to rewrite an unambiguous contract which does not contravene some principle of public policy. *Id.* at 461, 322 N.W.2d at 485.

Here, the LMDDR unambiguously lays down two avenues of liability to the dealership. First, the dealership agreed to pay a monthly lease charge based on a stated formula.[23] Special verdict question no. 57

[23]The LMDDR provides in relevant part:

relates to the amounts the dealership owes to Ford under this provision. Second, the dealership agreed to pay for the purchase of the leased vehicles upon termination or expiration of the agreement. Ford's right to recover under these provisions was set out in separate special verdict questions.

We reject the dealership's contention that the termination and expiration provision somehow acts as a "liquidated damages" provision totally governing Ford's right to damages under the LMDDR. This

---

III. *Lease Charge.* The monthly lease charge for each Leased Vehicle, including insurance provided by Company, shall be computed and paid as follows:

(a) A monthly depreciation charge shall be paid equal to 2.0833 percent of the capitalized cost of each vehicle. Such capitalized cost shall be equal to the Company's wholesale delivered price to authorized dealers therefor less holdback, less LMDA charges, and less such applicable allowances under other programs as the Company may from time to time announce, plus gasoline and anti-freeze and Schedule B Destination and Delivery charges to the Lessee's premises. At Company's option, holdback and LMDA charges may be included in capitalized cost.

(b) A monthly charge shall be paid for insurance on each vehicle, provided by the Company in accordance with paragraph VII herein, equal to the monthly cost therefor to the Company.

(c) A monthly lease service charge shall be paid equal to one-twelfth of the annual lease service charge multiplied by the sum which is the capitalized cost of each vehicle reduced by 2.0833 percent of such capitalized cost for each month the monthly vehicle lease charge has been paid. The annual lease service charge shall be determined by adding three-fourths percentage point to the New York prime lending rate in effect on the second-to-last working day of each month and shall be applicable to all Leased Vehicles with in-service dates during the next succeeding calendar month.

(d) Billing and payment of monthly vehicle lease charges shall be in accordance with such procedures as the Company shall establish from time to time.

clause in no way purports to nullify existing dealership obligations arising under the monthly lease charge provision.

Next, the dealership complains that the Ford exhibit used by the jury to calculate the monthly lease charge deficiency under the LMDDR contained erroneous information. The dealership asserts that, on February 29, 1980, Ford agreed to defer the dealership's obligations for two months in exchange for compliance with a list of requirements.[24] Without pointing to the particular language, the dealership asserts that Ford also agreed to waive any monthly lease charges "for vehicles not being utilized" under the rental contract.[25] The dealership argues that Ford's exhibit contained charges for the unused vehicles.

Our review of the February 29, 1980 agreement indicates that the only language somewhat supportive of Lyons' position is the clause which reads:

> In the event of sale of the dealership assets or common stock, Budget Rent a Car will be responsible for the payment of current amounts due you for the fleet *then employed,* which payments fall due on or after the date of sale of the dealership assets or common stock. [Emphasis added.]

---

[24]At special verdict question no. 65, the jury found that Ford entered into the February 29, 1980 agreement with Milwaukee Rentals, Green Bay Rental Cars, United Rent-A-Car and United Leasing Services.

[25]Lyons describes these vehicles as "dead-head vehicles" which are defined as vehicles "remove[d] from service and ma[de] available for pick-up by Ford."

462

The exact meaning of the term "then employed" is unclear. We are not, however, required to resolve this ambiguity because this clause provides that it is only effective in "the event of sale of the dealership assets or common stock." The dealership franchise was never sold but was terminated by Lyons and, consequently, this clause was not in effect.[26] Therefore, we affirm this portion of the judgment which awarded Ford damages against the dealership for breach of the LMDDR.

## F. *Fraudulent Conveyance*

The jury found that the dealership had fraudulently released the Budget Rent-A-Car operations from obligations which the dealership, in turn, owed to Ford in violation of ch. 242, Stats. Damages totaling $50,000 were apportioned among the various Budget companies. The dealership raises several challenges to these findings.

First, the dealership argues that the trial court refused to instruct on the proper burden of proof regarding this issue. It is undisputed, however, that the dealership failed to request this instruction at the instructions conference. As a result, the dealership has waived its objection. *See* sec. 805.13(3), Stats.

---

[26]The dealership objects to the inclusion of monthly lease charges in Ford's damage exhibits for the month following the termination of the LMDDR. The evidence indicated, however, that the vehicles under this agreement were not turned over to Ford until after the month following the termination had passed. Therefore, we cannot conclude that the inclusion of these charges was erroneous.

However, the dealership points out that it did raise a burden of proof objection in the midst of the trial court's instructions to the jury. While the record is somewhat supportive of the dealership's position, we consider the form and timing of the dealership's objection to be insufficient to preserve this issue for appellate review.

During the trial court's instructions, the dealership's counsel pointed out his belief that certain causes of action, including the fraudulent conveyance claim, required the middle burden of proof. When the trial court pressed counsel on this point in a later exchange, counsel repeated his position but failed to include the fraudulent conveyance claim amongst those which he contended required the middle burden of proof.[27]

---

[27]During the trial court's instruction to the jury, the dealership's counsel entered the following objection:

> MR. SANDFORT: Judge, just with respect to the instructions given thus far, the only burden that the Court has discussed—burden of proof—is the lowest burden, and I don't know if the Court intended later to address the middle burden, but with respect to the claims of the parties I represent, the tort of bad faith, punitive damages and intentional interference with contract require the middle burden as does, I believe, *Ford's claim for fraudulent conveyance,* and so I just don't want—the middle burden has to be discussed with respect to at least those four claims, and I just want to bring that to the Court's attention. [Emphasis added.]

After opposing counsel stated his position regarding this objection, the trial court and appellants' counsel had the following colloquy:

> THE COURT: All right. Mr. Sandfort, once again the middle burden you maintain is to be applied to what question?

> MR. SANDFORT: Certainly to the questions on the intentional tort of bad faith. The punitive damage question I believe is required—requires the middle burden. Intentional interference

Section 805.13(3), Stats., requires that a particularized objection to a proposed instruction be set forth. The purpose of such a requirement is not only to notify the trial court of the objection, but also to afford a basis for correction. *In re C.E.W.,* 124 Wis. 2d 47, 54, 368 N.W.2d 47, 51 (1985). Here, counsel's subsequent failure to include the fraudulent conveyance cause of action amongst those which he contended required the middle burden of proof resulted in the trial court not addressing the issue. Therefore, we deem it waived for purposes of appeal.

Next, the dealership alleges error in the trial court's formation of special verdict question no. 15 relating to the issue of the dealership's alleged fraudulent conveyances. Specifically, the dealership complains that the trial court failed to include the element of insolvency which is necessary to a fraudulent conveyance under ch. 242, Stats.

The form of a special verdict is within a trial court's discretion and an appellate court will not interfere with it if the material issues of fact are encompassed within the question asked and appropriate instructions are given. *Naden v. Johnson,* 61 Wis. 2d 375, 382, 212 N.W.2d 585, 588 (1973). Here, it is undisputed that the trial court included the element of insolvency in its instructions to the jury. The

with the employment contract of Mr. Lyons requires the middle burden. I guess my problem with respect to the 218 claim, the unconscionable conduct, forced vehicles, unreasonable withholding of approval and improper termination of agreement is that the treble damages applies only to the dealership under the Court's ruling, not to the rest of the entities. So you kind of got a mixed bag there it seems to me. I guess I have no objection to the middle burden on these matters as well.

inartful phrasing of a verdict question can, in an appropriate case, be salvaged by a correct jury instruction on the subject. *See Reiman Assocs., Inc. v. R/A Advertising, Inc.,* 102 Wis. 2d 305, 321, 306 N.W.2d 292, 301 (Ct. App. 1981). Consequently, we conclude that the jury was properly presented with the fraudulent conveyance issue.

Next, the dealership argues that the evidence was insufficient to support the jury's finding that the dealership's release of the Budget obligations caused the insolvency. We will not upset a jury verdict if credible evidence supports it. *Meurer v. ITT Gen. Controls,* 90 Wis. 2d 438, 450, 280 N.W.2d 156, 162 (1979). The credibility of witnesses and the weight given their testimony are left to the jury's judgment. *Id.*

The record reveals that the dealership failed to collect approximately $50,000 from the Budget companies which would, under normal conditions, be turned over as payment to Ford. The record also indicates that at the time the dealership was unable to pay its bills, this uncollected account represented one of the largest accounts receivables due the dealership. Consequently, the jury's conclusion that the dealership's failure to collect this account caused its insolvency is supported by the credible evidence.

Next, the dealership contends that the jury's apportionment of damages, related to the fraudulent release of indebtedness, as between the various Budget companies, is not supported by the credible evidence. We disagree. The record indicates that the dealership lumped all of these entities under one account receivable. The jury's division represents an

attempt by it to apportion the $50,000 damage between the Budget companies on the basis of their vehicle use in other areas. The apportionment is supported by the credible evidence. Therefore, we affirm this portion of the judgment which awarded Ford damages for the dealership's fraudulent conveyances.

## G. *Replevin*

It is undisputed that the trial court failed to submit the replevin questions contemplated by sec. 810.13, Stats.[28] The dealership contends this was error. Ford counters that special verdict question no. 8 and the jury's answer nonetheless effectively established that Ford was entitled to possession of the LMDDR vehicles. Special verdict question no. 8 inquired:

> Did the Ford Motor Company terminate the Lincoln-Mercury Dealer Daily Rental Contract for a reason other than an honest belief that the prospect of payment was impaired?

The jury answered this question "no," thus justifying Ford's termination of the agreement.

We recall our standard of review which holds that the form of a special verdict is within the trial court's discretion and we will not interfere if the material

---

[28]Section 810.13, Stats., provides:

> Upon the trial the court or jury shall find: (1) whether the plaintiff is entitled to possession of the property involved; (2) whether the defendant unlawfully took or detained the same; (3) the value thereof; (4) the damages sustained by the successful party from any unlawful taking or unjust detention of the property to the time of the trial. Judgment shall go in accordance with s. 810.14.

467

issues of fact are encompassed within the question asked and the instructions given. *Naden,* 61 Wis. 2d at 382, 212 N.W.2d at 588.

Replevin is a possessory action. *Confidential Loan & Mortgage Co. v. Hardgrove,* 259 Wis. 346, 350, 48 N.W.2d 466, 468 (1951). "The doctrine rests upon the theory that where property of one person is seized under a process against another there does not result a legal custody, and the person aggrieved thereby is entitled to the same remedy in the law as for any other tortious act." *Id.* Thus, which party is entitled to possession of the disputed property becomes the ultimate fact question in a replevin action.

Here, under the LMDDR, the dealership was obligated to purchase the vehicles upon termination, an event which could occur at the insistence of either party "at will." However, the trial court did not read this "at will" option literally, but rather interpreted the provision under sec. 401.208, Stats.,[29] which requires a good faith belief that the prospect of payment or performance is impaired. Thus, the trial court worded special verdict question no. 8 to require an "honest belief" by Ford that payment was impaired. When the jury answered this question in a fashion

---

[29]Section 401.208, Stats., provides:

A term providing that one party or his successor in interest may accelerate payment or performance or require collateral or additional collateral "at will" or "when he deems himself insecure" or in words of similar import shall be construed to mean that he may do so only if he in good faith believes that the prospect of payment or performance is impaired. The burden of establishing lack of good faith is on the party against whom the power has been exercised.

which justified Ford's termination of the agreement, the only conclusion that logically or legally followed was that Ford was entitled to possession of the vehicles because the dealership had refused to purchase them. Therefore, we see no abuse of discretion in the trial court's formation of the special verdict replevin question.

Had the jury answered question no. 8 differently, the dealership might well have been entitled to the remaining replevin questions contemplated under the statute. However, the jury's response rendered these remaining issues moot.

## H. *Form of Certain Damage Questions*

Questions Nos. 12 and 13 inquired as to what damages would "fairly and reasonably compensate" Ford for damages "arising as a result of" the SSA and FRAC termination. The dealership complains that these questions are improper because the trial court did not also include a causation question. We disagree and conclude that these questions adequately incorporate a causation element.

The form of the special verdict is left to the discretion of the trial court. *Naden,* 61 Wis. 2d at 382, 212 N.W.2d at 588. "Most cases concerned with the question of cause in contract actions simply inquire whether the damages were 'caused' [by] or 'a result of' the breach." *Reiman,* 102 Wis. 2d at 321, 306 N.W.2d at 300–01 (Ct. App. 1981). Here, the trial court opted for a question using the "as a result of" form. We see

no error in the trial court's exercise of discretion in this regard.[30]

Moreover, the case law recognizes that "a cause-in-fact determination in contract actions, no matter how phrased, is circumscribed by a jury instruction that incorporates the doctrine of *Hadley v. Baxendale.*" *Id.* at 321, 306 N.W.2d at 301. This doctrine states that the sum awarded must compensate the wronged party for damages which arise naturally, according to the usual course of things, from the wrong and must be such as is reasonably to be supposed to have been in contemplation of both parties at the time they made the contract as a probable result of the breach of it. *Id.* at 320, 306 N.W.2d at 300. As in *Reiman,* the trial court in this case properly instructed the jury regarding the *Hadley* doctrine. Consequently, we conclude that the cause issue was properly presented to the jury. *See id.* at 322, 306 N.W.2d at 301. *See also Paper Mach. Corp. v. Nelson Foundry Co.,* 108 Wis. 2d 614, 627–28, 323 N.W.2d 160, 166–67 (Ct. App. 1982).[31]

---

[30]The dealership also couches its objection in terms of the trial court's failure to include a question regarding whether the dealership breached the SSA and the FRAC. Although the dealership appears to have clearly separated the breach and cause objections in the trial court, the issue maintained for appeal appears to be focused solely on the issue of cause. In motions after verdict, the dealership stated that it is unclear whether questions Nos. 12 and 13 are predicated on breach of contract claims because the questions fail "to address the separate fact question of 'CAUSE' as a precondition to any award of damages." As a result, we conclude that the sole issue maintained on appeal relates to the question of cause.

[31]Lyons also claims that portions of the special verdict are perverse because, on certain claims, the jury found that Ford or Ford Credit's breach was a cause of damages, but then set the

## I. *Ford's Breach of Contract*

The jury found that Ford breached its SSA with the dealership by failing to provide signs and counseling to the dealership. Damages in the amount of $50,000 ($25,000 for each violation) were awarded. Ford challenges these findings on cross-appeal.

As to its alleged failure to provide signs to the dealership, Ford claims that the SSA did not obligate it to provide signs and, therefore, it is not liable to the dealership as a matter of law. We agree.

As we have already noted, the construction of a written contract involves a question of law and we owe no deference to the trial court on the issue. *Demerath,* 121 Wis. 2d at 197, 358 N.W.2d at 543. The SSA provides that "[t]he *Dealer* shall install and maintain at the DEALERSHIP LOCATION signs of good appearance ... ." (Emphasis added.) The agreement contains no language requiring Ford to supply any signs. Therefore, Ford cannot be liable to the dealership for this alleged omission. This portion of the judgment is reversed.

---

amount of damages at zero. Because Lyons fails to cite any legal authority supporting this argument, we decline to address this issue. *See State v. Shaffer,* 96 Wis. 2d 531, 545–46, 292 N.W.2d 370, 378 (Ct. App. 1980). Lyons also raises a number of challenges to Ford and Ford Credit's damage figures. The challenges are largely meritless. Their arguments are mostly redundant of other issues already addressed by this court or lack the specificity necessary to warrant this court's review. Lyons does, however, point to the testimony of John P. Wynn and asserts that it is insufficient to support the corresponding damage claims. Upon review of the Wynn testimony, we find it sufficient to warrant the submission of the issues to the jury and to support the damage awards as determined by the jury.

However, we do not accept Ford's additional argument regarding its obligation to provide counseling to the dealership. It is undisputed that the SSA required Ford to provide this counseling:

> To assist its dealers in these responsibilities, the Company establishes and periodically updates standards of operation and planning guides based on its experience and current conditions. It also offers sales and service training courses, advice as to facilities [and] counseling in the various phases of dealership operations ... .

Whether Ford breached its contractual obligation to counsel the dealership presents a question of fact which is left to the jury to answer. *See Koenings,* 126 Wis. 2d at 358, 377 N.W.2d at 598.

The credible evidence indicated that Ford breached its obligation by failing to provide adequate counseling to the dealership. A Ford witness testified on cross-examination that the Ford factory representative was nicknamed "the phantom" because of infrequent visits to the dealership. In addition, the evidence indicated that Ford offered the dealership little assistance because it was jealous of the Lincoln-Mercury division's control of the Kenosha point. Therefore, we affirm this portion of the judgment.[32]

---

[32]United Leasing Services and United General Leasing obtained favorable verdicts against Ford and Ford Credit on a number of causes of action. The trial court vacated these awards on the grounds that these causes of action belonged to the corporation-not to these claimants in their shareholder or creditor status. We are not required to address this issue since we have previously overturned any awards to these entities on other grounds.

## VI. CONCLUSION

We affirm the judgment in part and reverse the judgment in part in accordance with our holdings herein setting aside the following jury awards:

1. all awards for the claimed tort of bad faith;

2. the award based upon the conspiracy claim against Ford and Ford Credit; and

3. the sec. 218.01(3)(a)11, Stats., unconscionable practices awards against Ford with the exception of the award to the dealership.

We reinstate the following jury awards and upon remand direct the entry of judgment in accordance with the verdict as to:

1. the FPFA breach of contract award to the dealership and against Ford Credit;

2. the breach of contract awards to Green Bay Rental Cars and Wausau Car Rentals against Ford; and

3. the sec. 218.01(3)(a)11, Stats., unconscionable practices award to the dealership and against Ford.

We affirm the judgment as to the following:

1. the sec. 218.01(3)(a)15, Stats., "unordered vehicles" award against Ford;

2. the SSA breach of contract award against Ford for failure to provide dealership counseling;

3. the FRAC breach of contract award to Ford;

4. the SSA breach of contract award to Ford;

5. the LMDDR breach of contract award to Ford; and

6. the fraudulent conveyances award to Ford.

We reverse the judgment as to the following:

1. the deficiency judgment award to Ford Credit;

2. the SSA breach of contract award against Ford for failure to provide signs; and

3. the sec. 218.01(3)(a)15, Stats., "unordered vehicles" award against Ford Credit.

In addition to the above, we direct, upon remand, that judgment be entered following:

1. the trebling of the dealership's damages for Ford's unconscionable practices under sec. 218.01(3)(a)11 and 218.01(3)(a)15, Stats.;

2. further proceedings to determine the dealership's costs and reasonable attorney fees related to the sec. 218.01(3)(a)11 and 15 violations; and

3. further proceedings to determine Ford's deficiency judgment under the LMDDR and Michigan law including a calculation of Ford's costs and reasonable attorney fees related to its repossession and sale of the vehicles under the LMDDR.

Costs on appeal are denied to all parties.

*By the Court.*—Judgment affirmed in part, reversed in part and cause remanded.